No. 56,983

MARY JANE MORRIS, *Appellee*, v. W. DAVID FRANCISCO, M.D., *Appellant*.

(708 P.2d 498)

Opinion filed October 25, 1985.

*M. Warren McCamish,* of Williamson & Cubbison, of Kansas City, argued the cause and was on the brief for appellant.

*Lynn R. Johnson,* of Shamberg, Johnson, Bergman & Goldman, Chartered, of Shawnee Mission, argued the cause, and *John E. Shamberg* and *Sarah A. Brown,* of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is a medical malpractice action in which plaintiff Mary Jane Morris was awarded the aggregate sum of $1,250,000 against defendant physician W. David Francisco. Defendant appeals from the judgment.

The facts in this case are quite complex. As certain issues require in-depth discussions of various facets of the evidence, we will, at this point, provide only a brief overview of the relevant facts. Mary Jane Morris has been a victim of cerebral palsy since her birth, which was approximately 1961 (exact date not provided). Between 1965 and 1978 she was a patient of the defendant physician at the Cerebral Palsy Clinic at the University of Kansas Medical Center. During that period of time, Ms. Morris underwent multiple operations and extensive therapy in treating her affliction. In the spring of 1978, Dr. Francisco determined that Ms. Morris needed additional surgery on her hips and ankles to enhance and preserve her ability to walk. The ankle surgery was scheduled for September 1, 1978, with the hip surgery to occur on September 15, 1978.

On September 1, 1978, Dr. Francisco learned that three orthopedic resident physicians would be available to assist him with the surgery rather than the one resident usually scheduled. Dr. Francisco then decided to perform all the surgical procedures (hips and ankles) on September 1. Dr. Francisco believed this was advantageous to the patient as the need for a second general anesthetic would be eliminated and the recovery period would be reduced by two weeks.

The surgery commenced with Dr. Francisco directing and assisting resident physician Stitt in the performance of a psoas tenotomy on the patient's right hip. After this was completed, Dr. Francisco told Dr. Stitt to perform the same surgery on the left hip. Dr. Francisco and the other two residents then performed the ankle surgeries while Dr. Stitt proceeded with the left hip surgery. Sometime after surgery it became apparent that something had gone wrong. The patient, ambulatory before surgery, was unable to walk. The problem was ultimately identified as damage to the left femoral nerve. Although now able to walk a few steps, Ms. Morris has been, postsurgically, essentially non-ambulatory and will have to rely permanently on a wheelchair.

Ms. Morris filed suit against Dr. Francisco alleging the damage

to her left femoral nerve was the result of Dr. Francisco's negligence in permitting a resident to perform the left hip surgery without proper supervision. At trial the jury returned a verdict in favor of plaintiff in the aggregate amount of $1,250,000. Dr. Francisco appeals therefrom.

We turn now to the issues. For his first issue, defendant contends the trial court erred in allowing the refiling of this case after the dismissal of a prior action.

The facts relative to this issue are as follows. The first action was filed on October 2, 1980. Service was not obtained on the Commissioner of Insurance for the Kansas Health Care Stabilization Fund within ten days as required by K.S.A. 1984 Supp. 40-3409 and plaintiff voluntarily dismissed the action, refiling the same on December 23, 1980. In this second action (80-C-13723), plaintiff was ordered, in the January 19, 1982, pretrial order, to list her expert witnesses on or before April 15, 1982. Plaintiff did not do so as she was having difficulty locating an appropriate expert. The case was scheduled for trial by jury commencing August 23, 1982. On May 12, 1982, plaintiff filed a motion to amend the pretrial order to extend the time for listing her expert witnesses until June 15, 1982. This motion was denied on June 25, 1982. On August 13, 1982, the following action was taken by the trial court:

"2. That the plaintiff's oral motion to reconsider the Court's Order of June 25, 1982 overruling plaintiff's Motion to Amend the Pretrial Order should be overruled based upon the fact that the trial of the above-captioned case is scheduled to commence on Monday, August 23, 1982 and that as a result thereof there is insufficient time for all parties to complete discovery if the plaintiff is allowed to amend the Pretrial Order for the purpose of listing witnesses, including expert witnesses, all of whom would have to be subject to depositions prior to trial.

"3. That in the interest of justice to all parties and in the interest of proceeding to a final determination on the merits of the cause of action stated in the above-captioned action, an involuntary dismissal pursuant to K.S.A. 1981 Supp. 60-241(b) should be entered and further that the plaintiff be allowed to refile her cause of action.

"4. That the dismissal pursuant to K.S.A. 1981 Supp. 60-241(b) should be, in the interest of justice, without prejudice and should not operate as an adjudication upon the merits.

"5. That as further terms and conditions of the dismissal, the plaintiff shall be specifically entitled to and may refile said cause of action, however, the refiling of said cause of action must be accomplished by the plaintiff filing a petition in the District Court of Wyandotte County, Kansas on or before October 15, 1982, and further that on the date of refiling the plaintiff must provide defendants'

counsel with the identity of the expert witnesses that are expected to testify on behalf of the plaintiff at the time of trial.

"6. That all court costs of the above-captioned action should be assessed to the plaintiff, including costs of all original depositions taken to date."

The second refiling of the action occurred on October 15, 1982. Defendant does not contend plaintiff failed to meet the conditions of refiling set forth in the August 13, 1982, decision. Rather, defendant contends such order was not proper as it did not comply with the requirement of K.S.A. 60-241(b). That is, none of the statutory conditions existed that could properly trigger entry of an involuntary dismissal with right to refile. Plaintiff argues that, inasmuch as defendant did not appeal from the involuntary dismissal entered in case number 80-C-13723, he cannot raise the issue on his appeal herein which is from the judgment entered in a subsequent case (82-C-3520). The point is well taken. Defendant is attempting to appeal an order entered in one case through the vehicle of an appeal in another case. The court lacks jurisdiction to determine this issue.

For his second issue, defendant contends the trial court erred in failing to sustain his motion for a directed verdict on the issue of causation.

The scope of appellate review on a motion for a directed verdict is that all facts and inferences are to be resolved in favor of the party against whom the ruling is sought. If the evidence is such that reasonable minds could reach different conclusions thereon, the motion should be denied. *Iola State Bank v. Bolan*, 235 Kan. 175, 187, 679 P.2d 720 (1984); *Casement v. Gearhart*, 189 Kan. 442, 445, 370 P.2d 95 (1962). Rulings on motions for directed verdicts are left to the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion. *State v. Stellwagen*, 232 Kan. 744, 659 P.2d 167 (1983).

The pertinent facts must be examined in some detail. Dr. Francisco decided that the ankle and hip surgeries would all be performed during the one operation. Specifically, these procedures were the following:

Ankles: Bilateral heel cord lengthening, right split anterior tibialis transfer, and left posterior tibialis transfer to the lateral side of both feet.

Hips: Intrapelvic psoas tenotomy and a tensor fascia lata release to both hips.

As previously noted, Dr. Francisco directed and assisted resi-

dent Stitt in the psoas tenotomy of the right hip. Following completion thereof, he, in essence, advised Stitt to perform the same operation to the left hip while he and the remaining two residents commenced the ankle surgeries. The injury to the left femoral nerve occurred during the left psoas tenotomy which was performed by Stitt.

Dr. Francisco sought a directed verdict on the issue of causation. His theory is that the damage sustained by Mary Jane Morris was caused by the portion of her operation performed exclusively by the orthopedic resident, Dr. Ronald Stitt. Dr. Francisco contends he could be found negligent only on the theory of respondeat superior either in failing to use due care in selecting his agent or employee, or if the agent or employee was negligent in the operation on the patient. *Voss v. Bridwell*, 188 Kan. 643, 364 P.2d 955 (1961). Appellant maintains both of Ms. Morris' expert witnesses testified Dr. Stitt was not negligent because the standard by which an inexperienced resident orthopedic physician is judged does not impose fault on Stitt. Dr. Francisco argues that, inasmuch as there is no evidence of negligence by Stitt, none can therefore be imputed to him as Stitt's principal or employer. Francisco's argument avoids the theory of the case. The issue of Dr. Francisco's own negligence was submitted to the jury. The jury was charged with determining whether Dr. Francisco was negligent in deciding to perform four different surgical procedures in the same operation with only the assistance of three inexperienced resident surgeons; in failing to properly supervise Dr. Stitt while he was performing the operation which caused the injury; in failing to properly identify and teach Dr. Stitt the proper retraction method of the femoral nerve; in failing to provide for Ms. Morris' maximum surgical safety; and in recommending and performing the psoas tenotomy in the absence of appropriate medical indications. No issues of negligence by Dr. Stitt were submitted to the jury. The jury found Dr. Francisco negligent and found his negligence caused the injury to Mary Jane Morris. The verdict is supported by the evidence. Dr. Gamble, appellee's expert, testified Dr. Francisco "did not take the proper precautions and did in fact deviate from the standard in terms of his supervision of the operative procedure and his teaching of the operative procedure." We conclude the trial court did not err in denying appellant's motion for a directed verdict.

The final two issues concern the awarding of damages for loss of time or income to date of trial and in the future. Defendant contends: (1) Neither of these damage elements should have been submitted to the jury; and (2) the awards for these elements of damage are excessive as they are not supported by the evidence.

The jury verdict reflects the following breakdown of damages awarded to the plaintiff:

"(a) Pain, suffering, disabilities, disfigurement, and any accompanying mental anguish suffered by plaintiff to date:

ANSWER: $ 82,000

"(b) Pain, suffering, disabilities, disfigurement, and any accompanying mental anguish plaintiff is reasonably certain to experience in the future:

ANSWER: $ 108,000

"(c) Loss of time or income to date by reason of her disabilities:

ANSWER: $ 70,000

"(d) Loss of time or income which is reasonably certain to be lost in the future:

ANSWER: $ 990,000

TOTAL DAMAGES: $1,250,000

The challenge in the issues before us is confined to elements (c) and (d), loss of time or income to date of trial and future loss of same. There is no claim that the awards for elements (a) and (b) for pain, suffering, etc. to date and in the future are excessive.

Preliminarily, the following should be noted. Without question, the evidence established plaintiff Mary Jane Morris is a remarkable young woman. She was placed for adoption but rejected by her would-be adoptive parents as an infant when it was learned she was not developing properly. Mary Jane, at age one, was diagnosed as being mentally retarded. Subsequently, this diagnosis was found to be incorrect. Her problem was cerebral palsy with spastic quadriplegia. Between 1962 and 1978, Mary Jane underwent numerous operations and extensive therapy at the Cerebral Palsy Clinic at the University of Kansas Medical Center (under the care of defendant Francisco). Mary Jane remained in foster care throughout her childhood. Despite difficulty in walking, speech defects, some upper body (arm and hand) disabilities, and difficulty in controlling facial muscles,

Mary Jane attended public schools and performed satisfactorily. Mary Jane did not let her handicaps overwhelm her and maintained a good attitude and a desire to be financially and physically independent. In high school, Mary Jane expressed a desire to become a kindergarten teacher or a teacher of handicapped children. During two summers prior to her 1978 surgery, Mary Jane worked as a teacher's aid in immigrant schools.

After her 1978 surgery, Mary Jane was confined to an electric wheelchair (her preexisting upper body disabilities precluded use of a manual wheelchair). Her loss of mobility was a tragedy for this courageous young woman. In her wheelchair, she sought and obtained clerical work and was so employed at the time of trial. She is to be commended for her spirit in the face of multiple physical problems that would have daunted many persons.

Nevertheless, the issues raised herein relative to submission of these elements of damage to the jury and the propriety of the jury's awards for loss of past and future earnings must be looked at objectively and the proper legal standards applied.

As far as the submission of these elements of damage to the jury is concerned, attention is directed to *Garrison v. Marlatt*, 224 Kan. 390, 580 P.2d 885 (1978), wherein we stated:

"In an action for personal injuries, the trial court should instruct the jury only on those items of damage upon which there is some evidence to base an award. It is not proper to give a general instruction on damages for 'any of the following shown by the evidence,' when there is no evidence to support an award for a particular item." Syl. ¶ 1.

See also *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 662 P.2d 1214 (1983), wherein we held that in a negligence action, recovery may be had only where there is evidence showing with reasonable certainty the damage was sustained as a result of the complained-of negligence. As a corollary, recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement.

In reviewing awards for pain, suffering and other subjective elements of damage, the following standard as iterated in *Ratterree v. Bartlett*, 238 Kan. 11, 707 P.2d 1063 (1985) applies:

" 'Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such

amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence.' "

Such awards are overturned only if the collective conscience of the appellate court is shocked. *Merando v. A.T.& S.F. Rly. Co.*, 232 Kan. 404, 656 P.2d 154 (1982).

Awards for objective elements of damage, such as loss of past and future income, are subject to a different standard of appellate review as they are grounded in mathematical calculation. As noted in 18 A.L.R.3d 88, Evidence—Impaired Earning Capacity § 2[a], p. 97:

"[D]amages for impairment of earning capacity cannot be recovered in a personal injury action where there is no evidence of such impairment or no evidence from which damages therefor can be calculated. Although the evidence need not show conclusively or with absolute certainty that earning capacity has been impaired, mere conjecture or speculation does not warrant an award of damages therefor in personal injury actions. All damages, however, are subject to some uncertainties and contingencies, especially those that seek to compensate for future injuries. Accordingly, most courts hold that in order to warrant a recovery for impairment of earning capacity in personal injury actions, the impairment of earning capacity must be shown with reasonable certainty or reasonable probability, and there must be evidence which will permit the jury to arrive at a pecuniary value of the loss."

See also 22 Am. Jur. 2d, Damages § 93, as follows:

"The process of ascertaining the amount of compensation to be awarded for impairment of the capacity to work or to earn requires (1) the determination of the extent to which such capacity has been diminished, (2) the determination of the permanency of the decrease in earning capacity, and (3) the fixing of the amount of money which will compensate for the determined extent and length of the impairment, including a reduction of the award to its present worth. *Evidence of substantial personal injuries is insufficient, of itself, to show a loss of earning capacity or to warrant an instruction on that subject.*

"There is no fixed rule for estimating the amount of damages to be recovered for loss or diminution of earning capacity. The jury should award a fair and reasonable compensation, taking into consideration what the plaintiff's income would probably have been, how long it would have lasted, and all the contingencies to which it was liable. As bearing on these matters, the nature and extent of the plaintiff's business, profession, or employment, his skill and ability in his occupation or profession, the loss or diminution of his capacity to follow it, as a consequence of the injury, and the damages he has sustained by reason of such loss or diminution may be shown and taken into consideration. The plaintiff's position in life may be taken into consideration, and the jury may consider the possibility of future increases in income, based upon plaintiff's character, intelligence, ability, and work record. The extent and seriousness of the plaintiff's

injury may be shown, and as a basis for comparison, proof as to his condition since the injury is admissible." (Emphasis supplied.) ·

Thus, we see the extent of the diminution or impairment of earning capacity is a relevant consideration and is arrived at by comparing what the injured party was capable of earning at or before the time of the injury with what the party is capable of earning after the injury. This is recovery for injury to the capacity to earn and is relevant in calculating a party's loss of earnings.

In addition, in determining the amount to be awarded for decreased earning capacity, the jury should consider the health of the injured party and the party's physical ability to maintain herself before the injury, as compared with her condition in these respects afterward. 22 Am. Jur. 2d, Damages § 95.

In reviewing an award for an objective element of damages such as loss of past and future income, an appellate court must look to the record to see if there is evidence to support the jury's calculation of pecuniary loss.

What evidence is there to support the verdict for loss of past and future income, that is, Ms. Morris' "before" and "after" earning capacity?

Ms. Morris was a high school student at the time of the injury involved herein. She had multiple existing handicaps—upper body limitations involving use of her arms, a speech defect making it difficult for her to be understood, limited facial muscle control, and problems with walking that made falls likely. She had worked as a teacher's aide the previous two summers. She had a desire to become a kindergarten teacher or a teacher of handicapped children. There is no evidence concerning: (a) whether her desire to become a teacher was a realistic expectation; (2) the anticipated income of such a teacher; (3) what effect her preexisting disabilities would have on her employability as a teacher; or (4) whether her post-injury condition affected her stated goal to become a teacher by reducing her employability in such capacity and if so, by how much loss of income. Ms. Morris, as a high school-age student, could handle only unskilled jobs. This was true both before and after the injury. She had difficulty in obtaining a clerical job, but did ultimately obtain such a job which paid approximately $10,000 per year. There is no evidence she could have obtained a higher-paying job without the additional handicap of the wheelchair—only that her placement

was more difficult by virtue of her lack of mobility. That she is employable is undisputed. She was employed at trial and had been for some time. When her present job terminates (it is a temporary job), she will be likely to have some "downtime" before gaining new employment, although her employment record has certainly been enhanced by the job experience. She now has evidence to show prospective employers that she can handle clerical employment.

Ms. Morris testified she plans to attend night school and become a certified public accountant. There was no evidence that this was not a realistic and achievable goal. The vocational counselors who testified that her lack of mobility made job placement more difficult were considering the matter from the perspective of placing her in an unskilled position comparable to her present employment. The record is silent on her employment prospects with such additional skills.

At the time of the preparation of jury instructions, defense counsel objected to the inclusion in the damage instruction of the element of future loss of income. It was certainly a legitimate question to raise. The trial court was concerned and directed the verdict form be split into separate awards for the different elements of damages in order that one could readily see how much was allowed for each element. The problems relative to the evidence of loss of income were apparent to court and counsel at the instruction conference attended by Warren McCamish (defendant's counsel) and Lynn Johnson (plaintiff's counsel). Although lengthy, the following exchange at the hearing is worthy of inclusion:

"THE COURT: . . . The difficulty as I see in this case, we have a young lady whose aspirations were to be a kindergarten teacher or someone in some capacity to aid or help disabled children. We have no evidence in this case whatsoever as to what such a person could expect to receive by way of income if she had achieved those aspirations. We've had no evidence in this case as to what her prospects of employment would have been in that type of endeavor because of her dexterity problems in her upper limbs, her upper extremities and her speech impairment. It's—she apparently is not only employable but employed at the present time. And her current employer is apparently extremely happy with her.

"MR. JOHNSON: Temporary.

"THE COURT: So we don't know whether her future is any less impaired from the standpoint of income than it was without the—or with the mobility in the lower extremities. I think if this jury would come in with say for instance a half a million dollars for loss of wages, it would most likely—I don't know if I could say

it would shock my conscience, but it would at least give me second thoughts on wanting to look at that.

"MR. JOHNSON: I think the difference, Judge, is that—and perhaps the instruction doesn't state it right, but what we're really talking about here is not a specific amount of loss of income, because we knew that we were not going to be able to put anybody really on the stand like an economist or anybody who could really go to that issue; but what we're really talking about here is loss of earning capacity, loss of the ability to have the opportunity to have the same job opportunities and income producing opportunities that she had before.

"And we had evidence from Shirley Heard, who I think is an experienced person, that her mobility is what is her primary limitation in finding jobs, and it does—in fact, I used those words, does that impair her future earning capacity? And she said yes. So I don't think that an amount—and I don't know what the amount might be that they would put down there—would necessarily have to be directly related to, quote, what she would have made as a kindergarten teacher as opposed to what she's making now.

"THE COURT: If you get into—and the only factor we're dealing with here is loss of income. Either past, present or future. If you're getting into the other aspects that you mentioned, then that goes into the—to what they're going to give her for her disability, for her suffering, disabilities, any accompanying mental anguish.

"MR. JOHNSON: No, the loss of income is derived from the reduced earning capacity. And so—

"THE COURT: But is there any reduced earning capacity?

"MR. JOHNSON: Yes.

"THE COURT: Is it more probably true than not to believe that she has suffered some loss of income?

"MR. JOHNSON: Yes, there's been evidence—there's been evidence of that and there's been no contrary evidence. I mean, I can't have any better evidence than to have—

"THE COURT: There has been possibly some circumstantial evidence, at least, if we consider what her aspirations were—

"MR. JOHNSON: I asked Shirley Heard that direct question, Your Honor. I said, based upon your knowledge, experience and training in vocational work, do you have an opinion as to whether this limitation has impaired Amy Morris's earning power compared to what it was? I mean. I couldn't ask the question any different way than that, you know, to get—

"THE COURT: But what is the element of damage? What is the standard of damage? How does this jury arrive at some figure to compensate, other than pure speculation?

"MR. McCAMISH: That's my objection.

"MR. JOHNSON: I don't think they have to engage in pure speculation. They can put down a figure that they believe—and I'll suggest to them a figure. I'm going to suggest to them what she's making now—and her job is going to end as of June, which is what Mrs. Waddle said. She's temporary. She'll be there one year.

"THE COURT: Not necessarily.

"MR. JOHNSON: Not necessarily. But again, that's one of the inferences that can reasonably be drawn from the testimony, which they're entitled to do. How

long will it take her to get another job? Another six months? Another year? And is $10,000 a year that she's making at that job what she would have been able to have made before? Well, we know she would have been able to have made more because of the testimony that her earning capacity has been impaired.

"It's not too difficult to present an argument that will give the jury some basis or foundation for coming up with a reasonable determination of what that might be.

"THE COURT: I'm going to let it go to the jury, and then I'll worry about it when they come back. At least this way we have a barometer on what damages they have awarded for those elements than if we just submit a general verdict form we have absolutely no idea.

"MR. JOHNSON: I frankly feel that the major element of her damages will be in the—what we call general damage area, and—

"THE COURT: I agree with you.

"MR. JOHNSON: Regardless of what testimony we might or might not have put on."

Clearly, the court and plaintiff's counsel anticipated, based upon the evidence, that the bulk of any damage award would be in the subjective categories as pain and suffering—referred to by plaintiff's counsel as the "general damage area." This was not the case. Out of a total damage award of $1,250,000 only $190,000 was in the "general damage area." The loss of income award totalled $1,060,000. We do not know what post-trial motions were made relative to these awards or the trial court's rationale in disposing of them.

After having carefully reviewed the record, we conclude that it was not error for the trial court to instruct on elements (c) and (d), loss of time or income to date and future loss of same. The evidence, although scanty relative to these elements of damage, was sufficient for submission to the jury. However, we must conclude that the awarding of $70,000 for loss of time or income to date and $990,000.00 for future loss of time or income are not supported by the evidence and are excessive. We affirm the jury's determination of the liability of defendant, but reverse the award of damages. Rather than singling out the two elements relative to loss of income for determination upon retrial, it would appear fairer to all concerned to direct retrial of all damage issues. The parties are free to agree, however, to limit the damage issue upon retrial to the loss of income elements, thereby, in effect, affirming the unchallenged portions of the damage award. (Pain, suffering and mental anguish, past and future.)

Before concluding, we direct the attention of the trial court and

counsel to the lead-in paragraph of the elements of damage verdict form utilized herein.

"If you have answered question[s] number 1 and 3 [issue of liability] in the affirmative, what amount of damages do you find the plaintiff, Mary Jane Morris, entitled as the result of the negligence of defendant in the following respects: [herein follow categories of damages.]"

PIK Civ. 2d 9.01 provides:

"If you find for the plaintiff you will then determine the amount of [her] recovery. You should allow [her] such amount of money as will reasonably compensate [her] for [her] injuries and losses resulting from the occurrence in question including any of the following shown by the evidence."

Although the instruction on damages followed PIK Civ. 2d. 9.01, the verdict form on the elements of damage could have led the jury into thinking an award must be made in each category. PIK Civ. 2d. 9.01 makes it clear that such is not the case. No issue was raised on appeal relative to this aspect of the instruction, but we raise it to facilitate the new trial.

The judgment of the district court is affirmed as to liability of the defendant and reversed as to all awards of damages. The case is remanded for new trial on the issue of damages only.

HERD, J., concurring in part and dissenting in part. I concur with the majority on the question of liability and dissent on the questions of damages.

I find adequate evidence to support every element of damages awarded by the jury. In a personal injury case it is unnecessary to introduce evidence of loss of time, earning capacity and earnings which will mathematically calculate out to the amount of the verdict. 22 Am. Jur. 2d, Damages § 89, p. 130, states:

"In a personal injury action, the plaintiff is entitled to recover the value of the time which he has lost because of the injury. . . .

"Simply because the plaintiff was not employed at the time of the injury, and thus had no earnings, is no bar to a recovery for the time lost. Inability of plaintiff to follow his ordinary pursuits is a proper element of damages regardless of whether he had actually been receiving compensation therefor."

In this case there is much evidence of the nature and extent of Ms. Morris' injury resulting from the operation. Her loss of time is unquestioned. The fact that she was ambulatory prior to the operation and is now unable to walk is important evidence of the change in her earning capacity. The majority opinion ignores

loss of time and earning capacity as elements of Ms. Morris' damages. 22 Am Jur. 2d, Damages § 92, p. 134, comments:

"In a personal injury action, the second element of damages for impairment of the plaintiff's earning ability is the decrease in his earning capacity. This is a recovery for injury to the capacity to earn and not for the plaintiff's loss in earnings; thus, an unemployed plaintiff can be compensated for this element even though he can show no specific loss of earnings. Also, an injured minor will not be denied recovery for loss of earning power or for prospective loss of earnings simply because he has no history of earnings."

Here there is evidence of actual monetary loss from loss of past and future earnings in addition to the evidence of loss of time and earning capacity. From all of this evidence the jury was justified in reaching its verdict. I would respect the jury as the appropriate finder of fact in our system and affirm the trial court.

PRAGER and LOCKETT, JJ., join the foregoing concurring and dissenting opinion.