NOT DESIGNATED FOR PUBLICATION

No. 127,089

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FRED BLANCK and TAMARA MOLLOY,
*Appellees*,

v.

RIKKI SMITH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Submitted without oral argument. Opinion filed February 7, 2025. Affirmed.

*Christopher M. Harper*, of Franke, Schultz & Mullen, P.C., of Kansas City, Missouri, for appellant.

*Jeffrey A. Wilson*, of DeVaughn James Injury Lawyers, of Wichita, for appellees.

Before GARDNER, P.J., MALONE and COBLE, JJ.

MALONE, J.:  Fred Blanck and Tamara Molloy were riding a motorcycle when they were hit by a car driven by Rikki Smith. Blanck and Molloy sued Smith seeking damages for their personal injuries as well as economic losses. The parties proceeded to a bench trial and the district court found for Blanck and Molloy, awarding them a total of $8,257,340.10, plus costs, for past and future medical expenses, lost wages, and noneconomic damages. Smith appeals, challenging only one aspect of the judgment:  the district court's award of future lost wages to Molloy in the amount of $1,286,375. Smith contends that the evidence presented at trial was insufficient to support the award.

1

Finding the district court's award for future lost wages is supported by substantial competent evidence, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of April 14, 2022, after having some drinks at a fundraiser at a VFW, Blanck and Molloy headed home for dinner at Molloy's house on Blanck's motorcycle. Although Molloy did not think that Blanck seemed impaired when they left, his blood alcohol content was well above the legal limit. On their way home, they were T-boned by a car while passing through an intersection. The car that hit Blanck and Molloy was driven by Smith, who was on her way to work. After stopping at the intersection, Smith attempted to make a quick left turn and did not see Blanck and Molloy coming. An officer who responded to the scene would later opine that Smith's failure to yield was the sole contributing cause of the accident.

Upon impact, Molloy was knocked unconscious, she and Blanck were thrown across the intersection, and the motorcycle went skidding some 35 feet. Blanck and Molloy remained on the pavement until emergency medical services arrived on the scene to rush them to the hospital. As a result of the crash, Molloy suffered extensive injuries, including: a broken pelvis, a displaced and shattered tibia and fibula in her right leg, torn ligaments in her right leg, a broken right heel, significant degloving fractures in her right foot, as well as nerve damage and a permanent loss of feeling in her right foot.

On June 10, 2022, Blanck and Molloy sued Smith, alleging they had sustained significant injuries due her negligence. In total, Molloy sought $10,000,000 in damages and Blanck sought $5,000,000.

Following discovery, the parties proceeded to a bench trial in September 2023. Molloy testified extensively about her injuries, various surgeries and procedures she

received, and how the fallout from the accident had impacted her life and her ability to work. Two of her treating physicians—Dr. Chad Corrigan and Dr. John Childs—also testified about the care they provided, the extent of Molloy's injuries, the prospects of her recovering any further, and potential future procedures and surgeries Molloy may require.

At the time of trial, Molloy's tibia, which had been shattered in the accident, was still not healed despite an intramedullary rod being placed in the bone to help it reset. Corrigan testified that it was unlikely that the bone would ever heal completely, and, although not a necessity, he thought Molloy could be a candidate for future surgery to address the nonunion. As for the many fractures in her foot, Childs performed a fusion surgery, and a "significant debridement of her calcaneal [that is, heel bone] wound with a very complex closure of her calcaneal wound." Given the nature of the foot injury, Molloy needed an Achilles contracture surgery to try to give her greater range of motion in her foot. Despite the procedure, Childs still expected that Molloy would have pain and discomfort in her foot and ankle for the rest of her life, and that she would likely always have difficulty walking due to the injuries. He also speculated that Molloy may need a tibiotalar fusion in her ankle, depending on how her symptoms develop.

Molloy's heel did not respond well to the initial reconstructive surgery and became necrotic; thereafter, surgeons attempted a reverse sterile artery flap surgery procedure, but it proved unsuccessful. After that attempt, doctors removed the flap and placed several skin grafts on top of Molloy's heel, which had to be repeated several times after she developed a staph infection. Despite more skin grafts being attempted, the wound repeatedly reopens unexpectedly and bleeds profusely—about once per month. Corrigan testified that Molloy has permanent loss of sensation in her heel, that she will always have trouble walking due to the injury, and that amputation may be necessary to alleviate her pain. He also testified that Molloy's pain and discomfort in her foot and heel pad is "likely to be long-standing," that her injuries are not likely to get better with age, and they will possibly cause compounding problems in other parts of Molloy's foot. For her part,

Molloy testified that she is constant pain and has limited range of motion in her ankle, that the wound on her heel consistently breaks apart and bleeds, and that both walking and standing are particularly painful and challenging for her.

Malloy introduced many photographs of her right ankle and foot as it appeared at the time of trial, including the following photograph as part of Exhibit 50:



Turning to her ability to work, Molloy testified that she had been employed at a bank for the previous 22 years and that she had intended to retire in that role. At the time of the accident, she was making $61,500 per year.

Following the accident, Molloy did not return to work for several months, and when she did return it was only in a part-time, work-from-home role. This light schedule was intended to accommodate her pain and injuries and only consisted of working a

4

couple of hours per day. She recalled that "[t]here were days [she] didn't work. There were days [she] worked two hours but it was split up between, you know, throughout the day[.]" Even when she was able to work, she had to take frequent breaks to "ice in between and get elevated because of the swelling."

Molloy finally returned to full-time work 11 months after the accident. Before returning, Molloy's doctors had released her to return to part-time sedentary work, and eventually they released her without restrictions. That said, Corrigan explained that work restrictions are not the same as work limitations—in other words, his release with no restrictions did not mean that Molloy would be able to work full-time at her job. He stated, "I always tell patients you don't have any particular restrictions in the sense I will let her do what she's able to do, but she also has functional limitations on what she's able to do so in the practice we sometimes recommend functional capacity." Corrigan had no doubt that Molloy's ability to perform work related duties would be decreased.

Upon her return to the office, Molloy soon began to doubt whether she could continue to work full-time due to her near constant pain, the side effects of her medication, her inability to sit still or stand for a long time, and her need for frequent breaks to ice and elevate her leg. Two weeks after her return, however, she lost her job because her "position was no longer needed at the bank."

When Corrigan was asked about Molloy's potential for long-term future employment, he testified:

> "I think if you look at the literature, gainful employment is possible only with very specific modified duties, right. I think if I were to give Tammy a long-term limitation, it's probably going to be a job where she's not standing, she's not walking, she's not lifting, pushing, pulling, it's going to be more of a sit down desk job only with certain provisions for her to get to and from work, things like that."

5

Corrigan also explained that any job would have to accommodate Malloy's restrictions:

> "[S]he'd have to undergo significant what we call a functional capacity evaluation, which would be an independent medical examiner would kind of determine what she's able to safely do without further potential harm.
>
> "If sitting at a desk for eight hours causes her foot to swell which causes more pressure on her foot which causes wound breakdown, that's not something we would consider safe and viable for her."

Molloy testified that she had looked around and had talked with friends about potential jobs but had not applied for any positions after being laid off because she was discouraged about her condition and inability to function normally. She acknowledged that she had been released from care by all of her physicians without restrictions and that she could potentially work but asserted that it would be troublesome and painful to do so. Molloy stated that she did not feel like she could perform any of the jobs she had looked into, including "different office jobs or para work or helping out at schools, different things like that." She explained that her inability to sit or stand for too long and trouble putting much weight on her foot made her concerned about her ability to ever work again. When asked about future employment, she testified that she was not optimistic:

> "Not at this time, no. Not—not one. I might be able to work one day but not the next. I mean, it's a struggle.
>
>  . . . .
>
> ". . . I might be able to work one day but the next it might be I might be on the couch all day. I don't know an employer that will allow me to just say, oh, I can't do it today or work at my free will so to speak."

Following the three-day trial, the district court ruled from the bench. The district court found Blanck's and Molloy's testimony about their injuries, pain, and recovery to be "[e]specially credible." The district court then made findings of fact about Molloy's

6

injuries, noting that "[s]he sustained serious injuries to her right heel, her right leg, her right foot, her right knee and her pelvis," and that "her injuries were painful and resisted healing, particularly to a degloved heel and a broken tibia." The district court continued:

> "Miss Molloy has been left with wounds that have healed but not completely after a year and a half. She testified credibly that she still suffers foot pain and has limited range of motion in her affected ankle. It is painful to walk and to stand and that sustained activity makes the pain worse.
>
> "Her balance is reduced because of the injury and the lack of sensation in her heel. She remains on occasional narcotic medications and over-the-counter nonsteroidal anti-inflammatory drugs. The skin graft on her heel breaks open once a week and bleeds. Since she lacks sensation in that portion of her foot, she must go through the additional humiliation of having others point out that there is blood in her shoe which she must wear at all times to protect her heel. She was unable to return to her job at the bank for months."

The district court then ruled that Smith was negligent in her driving, and that her actions were the cause of the crash. And despite Blanck's intoxication, the district court found that his actions did not contribute to the accident.

Turning to the damage award, the district court determined that Blanck suffered $1,202,325.29 in total damages and Molloy suffered $7,055,014.81 in total damages. As for Molloy's future lost wages, the district court found:

> "Future lost wages from April 1st, 2023 to February 28, 2044, which is Ms. Molloy's 65th birthday, is a period of 20 years and 11 months. The 20 years times $61,500, which was her annual salary at the time of her injury is $1,230,000. The 11 months would be $56,375 dollars for a total of future lost wages of $1,286,375."

In short, the district court calculated Molloy's future lost wages by multiplying her annual salary at the time of the accident by the amount of time until she would each

retirement age—20 years and 11 months. Smith did not request the district judge provide any additional findings of fact or more detailed explanation of its ruling. Smith's counsel stated, "I'm comfortable with the verdict returned and the Court made the findings of fact and conclusions of law. I'm satisfied with that." The district court later filed a journal entry incorporating its findings, and Smith timely appealed the district court's judgment. Blanck and Molloy filed a notice of cross-appeal, but they have since withdrawn it.

## THE DISTRICT COURT'S AWARD OF FUTURE LOST WAGES TO MOLLOY IS SUPPORTED BY THE EVIDENCE

Smith's only claim on appeal is that the district court erred in awarding future lost wages to Malloy because "there was no evidence whatsoever showing she is permanently unable to work." Molloy contends that the district court's award of future lost wages was supported by the evidence presented at trial.

"The purpose for awarding damages is to make a party whole by restoring that party to the position the party was in prior to the injury." *Burnette v. Eubanks*, 308 Kan. 838, 857, 425 P.3d 343 (2018). Nearly 40 years ago, the Kansas Supreme Court held that "[i]n reviewing an award for an objective element of damages such as loss of . . . future income, an appellate court must look to the record to see if there is evidence to support the jury's calculation of pecuniary loss." *Morris v. Francisco*, 238 Kan. 71, 79, 708 P.2d 498 (1985). The parties agree that this court must review the district court's award of damages for future lost wages to determine whether it is supported by substantial competent evidence. Substantial evidence means enough legal and relevant evidence that a reasonable person might accept as sufficient to support a conclusion. See, e.g., *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Moreover, when a verdict is challenged for insufficient evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. When the evidence, considered in the light most

favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Ohlmeier v. Jones*, 51 Kan. App. 2d 1014, 1021, 360 P.3d 447 (2015).

In *Morris*, the Kansas Supreme Court addressed the appropriate calculation of damages for future lost wages—also referred to as loss of future income or impairment of earning capacity. 238 Kan. at 78-82. Highly summarized, the *Morris* court explained that such an award represents a comparison of the injured party's earning capacity before and after their injury. 238 Kan. at 79. The court explained that although the injured party must present affirmative evidence of their impairment or inability to work, some uncertainty is permissible so long as the evidence shows that the loss is reasonably certain:

> "'[D]amages for impairment of earning capacity cannot be recovered in a personal injury action where there is no evidence of such impairment or no evidence from which damages therefor can be calculated. Although the evidence need not show conclusively or with absolute certainty that earning capacity has been impaired, mere conjecture or speculation does not warrant an award of damages therefor in personal injury actions. All damages, however, are subject to some uncertainties and contingencies, especially those that seek to compensate for future injuries. Accordingly, most courts hold that in order to warrant a recovery for impairment of earning capacity in personal injury actions, the impairment of earning capacity must be shown with reasonable certainty or reasonable probability, and there must be evidence which will permit the jury to arrive at a pecuniary value of the loss.'" 238 Kan. at 78 (quoting 18 A.L.R.3d 88, Evidence—Impaired Earning Capacity § 2[a], p. 97).

The *Morris* court explained how a damage award for future lost income should be calculated:

> "'The process of ascertaining the amount of compensation to be awarded for impairment of the capacity to work or to earn requires (1) the determination of the extent to which such capacity has been diminished, (2) the determination of the permanency of the decrease in earning capacity, and (3) the fixing of the amount of money which will

9

compensate for the determined extent and length of the impairment, including a reduction of the award to its present worth. *Evidence of substantial personal injuries is insufficient, of itself, to show a loss of earning capacity or to warrant an instruction on that subject.*

  "'There is no fixed rule for estimating the amount of damages to be recovered for loss or diminution of earning capacity. The jury should award a fair and reasonable compensation, taking into consideration what the plaintiff's income would probably have been, how long it would have lasted, and all the contingencies to which it was liable. As bearing on these matters, the nature and extent of the plaintiff's business, profession, or employment, his skill and ability in his occupation or profession, the loss or diminution of his capacity to follow it, as a consequence of the injury, and the damages he has sustained by reason of such loss or diminution may be shown and taken into consideration. The plaintiff's position in life may be taken into consideration, and the jury may consider the possibility of future increases in income, based upon plaintiff's character, intelligence, ability, and work record. The extent and seriousness of the plaintiff's injury may be shown, and as a basis for comparison, proof as to his condition since the injury is admissible.'" 238 Kan. at 78-79 (quoting 22 Am. Jur. 2d, Damages § 93).

With these principles in mind, Smith contends this court should "vacate the trial court's award of future lost wages and remand the issue for an amended judgment or re-trial on this issue." Smith argues that "[t]here was no evidence presented at trial that . . . Molloy was wholly unable to work and would never be able to work again." Smith does not challenge how the district court calculated the award, nor whether $1,286,375 was a reasonable sum. We observe that the district court did not reduce Molloy's award for future lost wages to its present value, as explained in *Morris*, but Smith made no objection to the calculation in district court and raises no issue about the calculation on appeal. An issue not briefed is considered waived or abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 643, 294 P.3d 287 (2013).

Molloy testified extensively about the impact of her various injuries on her ability to work. She explained that she has considerable trouble walking and standing, cannot

10

put weight on her right foot or kneel down, and has trouble balancing and a limited range of motion in her right foot. She testified that the skin grafts on her heel often reopen unexpectedly, and she is in near constant pain and discomfort, which is exacerbated by sustained activity and even by sitting for too long. Due to her pain, Molloy often must resort to taking narcotic pain medications and needs to often take breaks to rest, ice, and elevate her leg. She explained that while she tries to do what she can physically, her ailments are sometimes completely debilitating.

It is also unlikely that Malloy's physical condition will improve—her doctors testified that she may need additional surgeries on her ankle and leg and speculated that she may even need amputation one day. Molloy's doctors explained that her injuries and disabilities were not likely to improve. On top of the physical manifestations of her injuries, Molloy also suffers from psychological effects such as depression and inability to sleep which could further hinder her ability to work.

While Smith is correct that Molloy returned to her full-time job for several weeks before she was let go, she fails to credit Molloy's testimony that she did not think she would have been able to continue in her job because of her pain and various limitations. The district court stated that it found Molloy's testimony about her injuries and disability particularly credible—it is not the role of this court to second guess that assessment. And while Molloy acknowledged that she had not applied for any positions, she explained that she had spoken with friends and inquired about various jobs but was discouraged about her condition and inability to function normally. She also explained that she had not found any employers that could accommodate her limitations.

Smith affords significant credence to the fact that Childs and Corrigan released Molloy from their care without restrictions. But she does not address the distinction made between such a release and the actual physical limitations Molloy faces. As Corrigan noted, the two are not the same thing—his lifting of the restriction meant only that

Molloy could look for jobs that fit her physical abilities. That is, his release with no restrictions did not mean that Molloy would be able to work. In fact, Corrigan felt that Molloy's potential for long-term employment was significantly diminished because she could not stand, walk, lift, push, or pull. He speculated that any employment would need to be a sedentary position, but he credited her testimony that she could not even sit for extended periods of time because it caused her foot to painfully swell.

The evidence presented at trial supports the district court's award of damages for future lost wages to Molloy. While there was some evidence that Malloy may have been able to find some type of job after her accident, there is substantial competent evidence in the light most favorable to Molloy that her claim for future lost wages was reasonably certain. See *Morris*, 238 Kan. at 78. Molloy's testimony, which the district court found credible, along with the testimony of her treating physicians, supported her claim for future lost wages and she should not be barred from recovery, as a matter of law, simply because she tried to work for a brief time before trial. Smith is trying to turn a factual issue into a legal issue. Based on the arguments Smith presents on appeal, we conclude the district court did not err in awarding future lost wages to Molloy.

Affirmed.