No. 67,575

JOHN H. COTT, *et al., Appellees and Cross-appellants,* v. THE PEPPERMINT TWIST MANAGEMENT COMPANY, INC., *et al., Appellants and Cross-appellees.*

(856 P.2d 906)

Opinion filed July 14, 1993.

*Steve R. Fabert,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause, and *James P. Nordstrom,* of the same firm, was with him on the briefs for appellants and cross-appellees.

*Richard F. Hayse,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, argued the cause, and *Robert W. Coykendall,* of the same firm, of Wichita, and *Dan E. Turner* and *Phillip L. Turner,* of Topeka, were with him on the briefs for appellees and cross-appellants.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by The Peppermint Twist Management Co., Inc., (Peppermint Twist) from judgments in a personal injury case in favor of Cindia "Cindi" Cott and John Cott. The Cotts were injured when Peppermint Twist's employees served them Eco-Klene dishwashing liquid containing sodium hydroxide in place of a similar-looking alcoholic beverage. Peppermint Twist presents four issues with five subissues on appeal. The Cotts raise two issues on cross-appeal.

Cindi Cott; her husband, Charles Price; and her father, John Cott joined friends for an evening at the Peppermint Twist in Topeka, Kansas, on September 23, 1989. The nightclub promoted its drink specials. That evening, Peppermint Twist advertised watermelon shots for one dollar by posting it on a portable sign in the nightclub's parking lot, by writing it in grease pencil on a board at the entrance of the nightclub, and by periodic announcements over the loudspeaker. A watermelon shot contains Southern Comfort, Creme de Noyaux, and orange juice.

The front bar area of the nightclub had sinks for handwashing glasses. A "normal" dishwashing liquid was used at these sinks; however, the club ran out of this soap several weeks prior to September 23, 1989. The testimony was conflicting whether additional soap had been ordered and whether management authorized the use of Eco-Klene at these sinks. Heavy Duty Eco-Klene was the detergent used in the high-volume automatic dishwasher in the kitchen and was purchased and stored in five-gallon containers. The label on each Eco-Klene container warned that the product contains sodium hydroxide, that the product causes severe chemical burns, and that ingestion of the product could be fatal.

Sodium hydroxide is an alkaline substance and is commonly known as lye. It is an extremely dangerous corrosive and will burn human tissue very quickly if ingested. The degree of the injury will vary depending upon the manner in which the lye is ingested, that is, whether it is "gulped down" or sipped. Eco-Klene contains 30 percent sodium hydroxide in solution, which upon contact will burn tissue instantaneously and continuously, causing liquefaction, a dissolving of tissue. Liquefaction continues

until the lye is diluted by the liquid released from the breakdown of the cells. The ingestion of this liquid lye produces intense pain.

A Peppermint Twist employee transferred Eco-Klene from the five-gallon container into an unmarked pour-and-serve or hurricane container. The container was placed in the front bar area underneath the sinks. On September 23, the unmarked pour-and-serve container of Eco-Klene was placed on top of the bar and was mistaken for a container of watermelon shots. Both are red in color and similar in appearance. Eco-Klene has no odor. The container of Eco-Klene was placed on the tray of Mary Cottrell, one of the cocktail waitresses.

Mary stopped by the table where Cindi, Charles, John, and their friends were seated and solicited orders for watermelon shots. Cindi testified that she asked Mary about the drink and that Mary responded, "Yes, I've drank them. They're good. They taste just like watermelon." Cindi said she relied upon Mary's representations when she ordered a watermelon shot. Three watermelon shots were ordered. Mary poured the liquid from the pour-and-serve container into the shot glasses on her tray and then served them. Cindi and John each drank one of the watermelon shots.

Cindi testified that after she took a drink, she was in a state of shock because the drink was "very, very hot." She remembered sitting there staring and then grabbing her stomach and spitting. Cindi went to the bathroom and laid down on the floor of the handicap stall because she could not breathe. She described the sensation as "a fire, a very hot fire, burning inside of you from your belly all the way up and you [were] gasping trying to get air." Cindi thought she was dying and was concerned about what would happen to her young children.

Charles noticed other people heading for the restrooms and decided to check on Cindi. He found her unconscious on the floor with mucus coming out of her mouth. Charles climbed over the top of the stall because the door was locked. Cindi was not breathing when he reached her. After Charles performed the Heimlich maneuver on Cindi, a gust of air came out and she started breathing. The next thing Cindi remembered was Charles holding her head over the toilet and telling her "to get it out."

When Cindi regurgitated, some of the substance ended up on her hand, permanently scarring her hand.

John was surprised Cindi would try the mixed drink and watched her reaction. He noticed a funny look on Cindi's face after she took a drink. He then picked up one of the shot glasses and drank the contents. John testified that "[i]t felt like somebody just took a red-hot poker and jammed it down your throat." He grabbed his throat and then drank a cold beer. John remembers going outside and throwing up several times. He stated that it felt like his throat was closing down and that he felt· so bad he wanted to die.

John and Cindi subsequently were taken by ambulance to a local hospital. Their injuries, treatment, and prognosis will be discussed in conjunction with the issue on damages.

Approximately one dozen poisonings occurred at the Peppermint Twist on September 23, 1989. The Topeka-Shawnee County Health Agency conducted an investigation and concluded that Eco-Klene was not labeled for handwashing use and was transferred improperly to a food container and that the food container in which Eco-Klene had been stored was not labeled to reflect its contents and was not stored in a proper place for toxic items. These are violations of K.A.R. 28-36-26(g), part of the regulations governing food service establishments promulgated by the Kansas Department of Health and Environment (KDHE).

Cindi and John filed individual suits against Peppermint Twist, alleging strict liability, negligence, and breach of express and implied warranties. Peppermint Twist moved to add Ecolab, Inc., the manufacturer of Eco-Klene, as an additional party for purposes of fault comparison, pursuant to K.S.A. 1992 Supp. 60-258a(c). Cindi and John subsequently amended their petitions to include claims against Ecolab.

In a similar case filed against Peppermint Twist, the nightclub admitted it had breached the cocktail waitress' express warranty that the substance was "good" and it had breached. an implied warranty of merchantability by serving a drink not·of merchantable quality. Thereafter, Cindi and John jointly moved to dismiss with prejudice their claims against Ecolab and to dismiss without prejudice the strict liability and negligence claims· against Peppermint Twist. Based upon the settlement into which the plaintiffs

and Ecolab entered, the trial court dismissed Cindi's and John's claims against Ecolab. Cindi and John proceeded to trial, on a theory of breach of express warranty under K.S.A. 84-2-313. The trial court ruled, however, that Peppermint Twist could raise Ecolab's fault as an affirmative defense and have the jury compare the fault of Ecolab and the nightclub.

After the presentation of the plaintiffs' cases, they moved for a directed verdict on the breach of warranty claim. The trial court found Peppermint Twist breached the express warranty " 'that the material served was a watermelon shot, an alcoholic beverage fit for human consumption.' "

In distributing fault in both cases, the jury found Peppermint Twist 100 percent at fault and Ecolab zero percent at fault. Ten out of twelve jurors were in agreement to award Cindi $2,500,000 as follows: $1,100,000 for past and future medical expenses; $360,000 for future loss of income; and $1,040,000 for past and future pain and suffering, including mental anguish and disfigurement. The jury unanimously awarded John $750,000 as follows: $80,000 for past and future medical expenses; $100,000 for past and future loss of income; and $570,000 for past and future pain and suffering, including mental anguish and disfigurement. The trial court applied K.S.A. 1992 Supp. 60-19a02 and reduced the damages for past and future pain and suffering to the statutory cap of $250,000. This reduced Cindi's total award to $1,710,000 and John's total award to $430,000.

The trial court denied Peppermint Twist's motion for remittitur or for a new trial. Peppermint Twist appealed. Cindi and John filed cross-appeals. Peppermint Twist's motion to transfer the appeal from the Court of Appeals to this court was granted.

## I. NEW TRIAL

Peppermint Twist contends it is entitled to a new trial on all issues because the evidence does not support the damages awarded and because the jury disregarded the trial court's instructions. "The granting of a new trial is a matter of trial court discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of that discretion." *Wahwasuck v. Kansas Power & Light Co.*, 250 Kan. 606, Syl. ¶ 7, 828 P.2d 923 (1992). "Judicial discretion is abused when

judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." *In re Marriage of Soden*, 251 Kan. 225, Syl. ¶ 9, 834 P.2d 358, *cert. denied* ___ U.S. ___, 121 L. Ed. 2d 540 (1992).

## A. DAMAGE AWARDS

Peppermint Twist only contests the sufficiency of the evidence for the objective elements of damage awards, that is the damages awarded for future medical expenses and for future loss of income. On cross-appeal, Cindi and John (the Cotts) raise a legal question about the damages awarded for pain and suffering, a subjective element of damage awards. The Cotts' question will be discussed later.

In arguing the evidence does not support the damage awards, Peppermint Twist initially relies upon K.S.A. 1992 Supp. 60-249a. Subsection (a) requires that a verdict in any personal injury action for damages be itemized as follows: noneconomic injuries and losses (pain and suffering, disability, disfigurement, and any accompanying mental anguish), economic injuries and losses, and medical expenses. Under subsection (b), such a verdict is to be further itemized into past and future damages. Subsection (c) specifies there must be some evidence to support an award before the jury is instructed upon any item of damage. Peppermint Twist claims error in the special verdict form used because the trial court failed to separate past and future damage awards. Peppermint Twist neglects to mention the court asked about, and Peppermint Twist's counsel agreed to lump together, past and future damage awards. If there was error, Peppermint Twist, through the actions of its counsel, consented to it and therefore cannot raise it on appeal. See *Mitchell, Trustee v. Moon*, 206 Kan. 213, Syl. ¶ 3, 478 P.2d 203 (1970), in which this court held: "A defendant may not complain of rulings or matters to which he has consented, or take advantage of error upon appellate review which he invited, or in which he participated."

In denying Peppermint Twist's motion for remittitur or for a new trial, the trial court concluded the "awards should stand despite an indication that the jury made no rigorous attempt to calculate the figures in the medical or wage categories." The trial

court described the injuries to Cindi's esophagus as "severe, traumatic, and long-lasting" and concluded that the jury took into account Cindi's life expectancy. The court acknowledged the award was generous, but determined the evidence supported the award because "of the potential exhibited by all the medical testimony of reoccurrences, potential replacements of the esophagus on numerous occasions, the cost of this, [and] the potential of cancer."

Peppermint Twist argues the jury award for Cindi's future medical costs is speculative, is not calculated reasonably from the evidence, and in fact is "outrageously disproportionate" to the evidence. According to Peppermint Twist, the jury awarded Cindi $1,078,933.31 for future medical costs because the total award was $1,100,000 and her past medical expenses were $21,066.69. The nightclub claims the evidence was that Cindi was undergoing an annual endoscopy at a cost of $386 per visit; that Cindi was undergoing periodic esophageal dilations; and that Cindi could perform the dilations herself, but if she chose to have a doctor perform them the cost was $84 per visit. Peppermint Twist emphasizes that even if Cindi had a doctor perform the dilation monthly, it would take 602 years to exhaust the jury's award. The nightclub contends the trial court "misstated the evidence" in that there was no evidence Cindi might need repeated surgeries. Peppermint Twist claims the evidence showed that one esophageal replacement surgery might be needed at a cost of approximately $95,000 and that the surgery would eliminate the risk of cancer and the need for future endoscopy and dilation. Peppermint Twist adds that because the doctors estimated the need for the surgery at less than one percent, the trial court erred in even allowing the jury to hear this evidence. The nightclub maintains that even if the replacement surgery never occurred, there was no evidence Cindi's risk of cancer was substantial or even was more likely than not to occur.

" 'When a verdict is attacked on the ground that it is contrary to the evidence, it is not the function of this court on appeal to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the successful party, will support the verdict, this court should not intervene.' [Citation omitted.]" *Wahwasuck*, 250 Kan. at 617.

We view the evidence differently than does counsel for Peppermint Twist.

Dr. Robert W. Braun, a gastroenterologist, examined and treated Cindi the night she was taken to the emergency room. He immediately noticed that her lower lip was swollen and that she had extensive oral burns. Cindi complained of a burning in her chest and of epigastric distress. Dr. Braun performed an emergency endoscopy, which is a procedure that permits a doctor to examine the interior of a body canal. See Stedman's Medical Dictionary 513 (25th ed. 1990). He endoscoped Cindi's esophagus and stomach. The esophagus is a muscular tube that forms a canal between the mouth and the stomach. Anything taken into the mouth and swallowed "passes through the pharynx (throat) into the esophagus and from there into the stomach." 2 Schmidt, Attorney's Dictionary of Medicine and Word Finder E-172 (1993). Peristalsis, a succession of muscular contractions in the esophagus, propels food and drink downward and then helps keep food and drink in the stomach.

During the emergency endoscopy, Dr. Braun discovered "extensive oral burns, swelling or edema of the hypopharynx and the larynx." The hypopharynx are the muscles in the back of the throat, and the larynx refers to the vocal cords. He also observed that Cindi's "esophagus was diffusely inflamed with severe necrosis, erythema, which is redness, and [denudation] of the mucosa, meaning it appeared as if it had been stripped or dissolved away." Additionally, the doctor found active bleeding.

During a second endoscopy three days later, Dr. Braun found throughout the entire esophagus circumferential burns, which increase the risk of strictures. In this case, a stricture is an abnormal narrowing of the esophagus caused by the formation of scar tissue in response to the swallowing of a caustic substance. See 3 Schmidt, Attorney's Dictionary of Medicine and Word Finder 306-07 (Feb. 1993 Supp.). Strictures obstruct the passage of food, drink, and even saliva.

About one week later, on the day before Cindi was released from the hospital, Dr. Braun performed a third endoscopy. After observing esophagitis and early stricturing, he immediately dilated her esophagus. Dilation is an uncomfortable and sometimes

painful process that breaks up scar tissue and expands or stretches the diameter of the esophagus. The process ensures that the esophagus' airway remains open. A succession of gradually larger dilators are dropped down the patient's esophagus. Some doctors sedate the back of the patient's throat to reduce or prevent gagging.

Shortly after her release from the hospital, Cindi underwent another endoscopic examination in which Dr. Braun encountered four strictures. Twelve days later, the doctor performed another endoscopy, discovered that strictures were reforming in the same location with mild ulceration of the upper and lower strictures, and dilated her esophagus once again. Dr. Braun diagnosed Cindi with "[m]ultiple esophageal strictures secondary to caustic ingestion." He performed numerous dilations in the subsequent months. When the doctor last saw Cindi in August 1990, he was encouraged because the strictures were not reforming as quickly. In Dr. Braun's opinion, Cindi will need to be monitored by a physician and undergo dilations for the rest of her life. The doctor does not recommend self-dilation.

Dr. Phillip B. Miner, Jr., Director of the Division of Gastroenterology and Professor of Medicine at the University of Kansas Medical Center, began treating Cindi in August 1990. The doctor commented that for the rest of her life, Cindi's strictures will reoccur and she will need repeated dilation. Dr. Miner has tried to maintain monthly dilations and is teaching Cindi to dilate herself. Even if Cindi learns to dilate herself, she will need to see the doctor at least annually. Dr. Miner does not recommend esophageal replacement surgery.

Dr. John R. Lilly, who is a pediatric surgeon at The Children's Hospital in Denver and has studied esophageal replacement in children, examined Cindi in April 1991. The doctor also had access to the medical records of Cindi's treating physicians. Dr. Lilly noted Cindi had been receiving esophageal dilations monthly for the past year, but that dilation has not relieved all her symptoms. She is unable to eat solid foods such as meat. She suffers from heartburn, which is sufficiently severe to wake her at night. The topical anesthetic used in conjunction with the dilations leaves her ears burning for a couple of days. Cindi also complains of pain in her chest and in her back.

Dr. Lilly diagnosed Cindi as having "an esophageal injury leading to stricture formation, probably compounded by an element of gastroesophageal reflux responsible for her symptomatology." Gastro reflux refers to stomach acid refluxed into the esophagus because of the weakened valve between the stomach and the esophagus. The valve normally keeps the contents and acid in the stomach out of the esophagus. The doctor opined that ingesting lye damaged the valve. Symptoms of gastro reflux include heartburn and pain in Cindi's chest and back. Formation of scar tissue, stenosis or strictures, and chronic inflammation from the acid refluxing are some of the long-term effects. Generally, the usual treatment is an interabdominal operation in which a new valve is created; however, the operation would be risky for Cindi because of her damaged esophagus. Dr. Lilly concluded Cindi will have medical problems and need medical supervision for the rest of her life. Despite complications with esophageal replacement, the doctor recommended the surgery because of Cindi's "miserable existence." Dr. Lilly stated that if she does not have the surgery, she will need to be dilated, either by a doctor or by herself, a minimum of three or four times a year.

As previously mentioned, Cindi has difficulty eating solid foods; it can take solid food one-half hour to pass through Cindi's esophagus. Cindi does not eat much solid food and when she does, she takes very small bites and chews the food for a long time. Cindi no longer enjoys socializing and eating in restaurants because it takes her so long to eat and because food often gets caught in her esophagus, causing her to gag. When Cindi starts gagging, she will go to the restroom and stick her finger down her throat in order to make herself regurgitate. After dilation, Cindi cannot eat solid food the first couple of days or approximately three weeks later. Dr. Lilly acknowledged Cindi is "quite uncomfortable" the last week before her next dilation. In lieu of eating solid foods, Cindi drinks milk and Ensure, a high protein-caloric liquid, to help maintain her weight.

One of the dangers of dilation, also referred to as dilatation, is perforating the thin walls of the esophagus. Perforation can cause major internal bleeding or, more seriously, can allow bacteria to escape from the esophagus into the surrounding tissue, such as the heart. If infection sets in, the strictures worsen and

emergency surgery generally is required. Death can result. Additionally, food may become lodged in the esophagus, and attempts to dislodge the food may cause the esophagus to rupture. Other dangers include vomiting and aspiration with the primary complication of pneumonia and a slight risk of sudden death.

With regard to the surgery, sometimes the damaged esophagus can be removed and the remaining esophagus attached to the stomach. Other times part of the stomach may be used to patch the hole. Another possibility is an interpositional graft, which involves removing the esophagus and replacing it with another part of the intestinal tract, *i.e.*, the large or small intestine or the colon. There is, however, no satisfactory way to replace the esophagus. Interpositional grafts cannot replace peristalsis. Therefore, gravity is the only means by which to propel food downward. An individual who has had an interpositional graft is limited in the types of food that can be ingested and also must eat smaller meals and eat more frequently than someone whose esophagus functions normally. Additionally, food often becomes stuck in the esophageal replacement and eventually stagnates. This leads to stenosis, a type of stricture, and a new operation is required to correct the problem.

Interpositional grafts place an acid-bearing part of the intestine close to the mouth. This leads to ulcer formation and "a foul taste in the mouth." The individual's breath has such a bad smell that others can detect it as soon as the individual enters a room. If the colon is used as an esophageal replacement, there is a possibility of reflux of acid from the stomach into the colon, causing colitis with ulceration and bleeding.

An adult whose esophagus has been burned because of ingesting lye has an increased risk of cancer of the esophagus. The elevated risk has been estimated as high as a thousand-fold increase. Among individuals with similar injuries, Cindi's chances of developing cancer may be as high as 10 percent. If the general public is included, the increased risk is 3 percent. Because most lye ingestion cases have involved children, there are no reliable studies involving adults. The experts agree there is no way to determine whether an adult who has ingested lye and has strictures of the esophagus will get esophageal cancer; however, there is a risk factor and the individual should be concerned. This type

of cancer is treated with surgical removal of the cancerous portion of the esophagus and radiation. Cancer of the esophagus has a high fatality rate, with one expert stating the mortality rate is virtually 100 percent. Onset of the cancer usually occurs more than 20 years after the lye injury. The shortest reported time frame has been eight years. Surgical removal of the esophagus eliminates the risk of developing esophageal cancer.

Peppermint Twist argues: "Speculation concerning the dire nature of remote possibilities is insufficient, as a matter of law, to support a pecuniary award for the presumed actual occurrence of those consequences." In support of this argument, the nightclub cites *Morris v. Francisco*, 238 Kan. 71, 77, 708 P.2d 498 (1985), in which this court stated that "recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement." The nightclub also relies upon *Tamplin v. Star Lumber & Supply Co.*, 251 Kan. 300, 836 P.2d 1102 (1992), and *Sharples v. Roberts*, 249 Kan. 286, 816 P.2d 390 (1991), for the proposition that future medical damages can be awarded only if the evidence shows a "substantial possibility" or "reasonable probability" that such expenses will occur. Peppermint Twist's reliance upon the latter cases is misplaced. *Tamplin* concerned awards for mental distress, and *Sharples* addressed the criteria for establishing a medical malpractice claim based upon expert testimony.

The *Tamplin* court held:

"Anxiety based upon a reasonable fear that an existing injury will lead to the occurrence of a disease or condition in the future is an element of mental distress for which damages may be recovered. However, for the fear to be reasonable, it is not necessary to show that prospect of such an occurrence is a medical certainty or probability. It is sufficient if there is a showing that a substantial possibility exists for such an occurrence." 251 Kan. 300, Syl. ¶ 1.

The Cotts concede Cindi's future medical expenses cannot be determined exactly, but contend that alone does not invalidate the jury's award. See *Gregory v. Carey*, 246 Kan. 504, Syl. ¶ 2, 791 P.2d 1329 (1990) (Because "the issue of damages is a difficult one to calculate, the law has given juries great leeway in this area."); *Kansas Dept. of SRS v. Goertzen*, 245 Kan. 767, 774, 783 P.2d 1300 (1989) ("[T]he inability to calculate damages with

absolute exactness does not render them too uncertain to preclude their award."). More recently, in *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 362, 837 P.2d 330 (1992), we held:

"It is the function of the trier of fact to determine the amount of damages that should be awarded to a party, based upon evidence of the loss suffered. A reasonable basis for computation and the best evidence obtainable under the circumstances should enable the trier of fact to make an estimate which provides an adequate recovery of damages. [Citation omitted.]"

The experts did not agree on what course Cindi's future treatment should take. For example, Dr. Miner recommended continued monthly dilation and annual endoscopic examinations. Dr. Lilly recommended semiannual examinations. Peppermint Twist lists the cost of a dilation at $84 and an endoscopy at $386.

According to the jury instruction, Cindi was 24 years of age at the time of trial and could be expected to live 56 more years. Future medical costs for just these two procedures, based upon Cindi's testimony, is $336,000. This figure does not take into account the continued risk of perforation or the potential need for additional or more frequent monitoring. This figure does not consider that Cindi has as high as a 10 percent chance of developing cancer of the esophagus. Nor does it take into consideration inflation as reflected by medical costs over the last 25 years.

Dr. Lilly also recommended a different course of treatment—he recommended esophageal replacement surgery. The cost of such surgery is approximately $95,000. Because problems develop with esophageal replacements, additional operations are probable.

It seems likely that Cindi's future medical costs will include some combination of the above. Based upon the best evidence available under the circumstances, the jury's award has a reasonable basis for computation and is not based upon mere speculation.

The trial court upheld the damages awarded for John's medical costs, reasoning that the injuries John sustained were "extremely serious." The court concluded there was substantial medical testimony concerning potential medical costs for future throat and mouth problems as well as for the complications of cancer.

Peppermint Twist argues the evidence does not support an inference that John's injuries have the potential to worsen in the future. According to Peppermint Twist, the jury awarded John $45,463.83 for future medical costs because the total award was $80,000 and his past medical expenses were $34,536.17. The nightclub contends the only evidence of future medical costs was a semiannual check-up at a cost of $386 per examination. Peppermint Twist calculated it would take approximately 58 years of semiannual examinations to deplete the jury's award. According to the jury instruction, John was 56 years of age at the time of trial and had a life expectancy of 21.9 years. Peppermint Twist maintains future medical costs should not consider John's leukoplakia because John's treating physician testified that ingesting lye did not cause the condition. Furthermore, according to the nightclub, even if the condition resulted in cancer, it could be corrected medically at a maximum cost of $23,033. Again, we view the evidence differently.

Dr. Braun was John's emergency room treating physician. John complained that his throat was sore, that his tongue and chest burned, and that he was unable to swallow his own saliva. Dr. Braun noted that John was unable to handle his secretions and saliva and that John's oral membranes, tongue, palate, and pharynx were burned. The doctor performed an endoscopy, finding swollen vocal cords and extensive burns in the hypopharynx, larynx, esophagus, and stomach. Because John developed breathing problems, a tracheotomy, also referred to as a fiber optic direct laryngoscopy, was performed by an ear, nose, and throat specialist, Dr. Hsu, who confirmed Dr. Braun's findings. Dr. Braun performed another endoscopy three days later and found extreme inflammation of the esophagus "in its entire length and 'circumferentially' " as well as a large ulcer forming in the stomach. John was discharged from the hospital six days later, and his discharge diagnosis was accidental lye ingestion, "chemical burns of the pharynx/larynx with laryngeal obstruction," "lye burns of the esophagus, stomach, pharynx, and palate," "large gastric ulcers secondary to the ingestion," and emphysema.

The following day, Dr. Braun performed an endoscopy on John. The doctor found no evidence of stricturing, but observed the lower two-thirds of the esophagus oozed or bled upon touch. Dr.

Braun dilated John, encountering no obstructions. John underwent further endoscopic examinations and dilations in the following months. No strictures were found. Because John remains at risk for strictures, Dr. Braun recommended occasional endoscopy, particularly if John experiences difficulty in swallowing, loss of weight, burning or pain, feeling full immediately after eating, or vomiting. When Dr. Braun last saw John in January 1990, the doctor found no obvious stricturing and determined the healing and reepithelialization of the ulcer was complete.

Dr. Charley W. Norris, an ear, nose, and throat surgeon at the University of Kansas Medical Center, saw John two or three times between August 1990 and the trial in September 1991. Because of his specialty, Dr. Norris focused upon the chemical and lye burns outlined in John's discharge diagnosis. The doctor reviewed the discharge summary and also the laryngoscopies John underwent. The first laryngoscopy revealed John's vocal cords were swollen, but not liquefied. On John's right vocal cord, a white plaque, either referred to as hyperkeratosis or leukoplakia, was found. Both arytenoids, the vocal cords' hinge-like structures, were swollen severely. The second laryngoscopy revealed the right vocal cord still was swollen and had exudate on the surface, meaning pus or secretions accumulating in the area. Because of the burns caused by the lye ingestion, John had nearly unidentifiable anatomy in the hypopharynx and larynx. According to Dr. Norris, it is possible the lye could have been forced up into John's sinuses, thereby damaging the glands that secrete moisture for the nose, pharynx, and larynx.

Dr. Norris' first examination of John in August 1990 revealed both vocal cords were red, swollen, and puffy. He also found leukoplakia, a premalignant condition, on the right vocal cord. Because some smokers develop leukoplakia, the lye ingestion may have aggravated a preexisting condition. John had smoked cigarettes until 1969 and then changed to a pipe. John has had laser surgery to scrape the white plaque off of his vocal cord. The surgery decreased, but did not eliminate, the leukoplakia, which is difficult to eliminate totally. Dr. Norris recommends that John have his vocal cords examined regularly. There was evidence John should have check-ups every three to six months for the rest of his life. As long as John's vocal cords are abnormal, that is, red,

swollen, and puffy, John is at risk to develop cancer. Additionally, John will need further surgeries to remove the white plaque. If a malignancy occurs, a partial or total removal of the voice box and cobalt radiation therapy will be required.

Dr. Miner also reviewed John's discharge summary. Because of his area of expertise, the doctor focused upon the chemical burns to the pharynx, which transfers food into the esophagus, and the large gastric ulcers in John's stomach. Dr. Miner opined the difference between John's injuries and Cindi's injuries was that John held the lye liquid in his mouth longer and, because of that, John's injuries were more severe in his larynx and pharynx than in his esophagus. The doctor examined John and found evidence of ulcers. Based upon their unusual location and large scar form, Dr. Miner determined the ingestion of lye caused the ulcers. Dr. Miner recommends that John have an annual endoscopy because of the possibility of developing cancer of the esophagus or cancer in the stomach scar. If either cancer develops, it probably will occur 20 to 30 years after ingesting the lye.

Viewing the evidence in the light most favorable to the prevailing party, John will need to have his vocal cords checked every three months. "[A]ggravation of a pre-existing condition is compensable" in a personal injury action. *Kirk v. Beachner Construction Co., Inc.*, 214 Kan. 733, 737, 522 P.2d 176 (1974). Based upon Peppermint Twist's stated cost of $386 per visit, the cost of future examinations for John's life expectancy is $33,813.60. Dr. Miner also recommends an annual endoscopy, adding another $8,760 to John's future medical costs. Adding the costs of the vocal cord and endoscopic examinations together totals $42,573.60. After subtracting this amount from the future medical costs award of $45,463.83, less than $3,000 remains. The jury might have awarded more money for these examinations; the jury might have concluded the ingestion of lye aggravated John's preexisting condition of leukoplakia and awarded approximately $3,000 toward the vocal cord surgery, which was estimated to cost $24,308; or the jury might have awarded less money for the examinations and more money toward the surgery. Regardless of which scenario the jury followed, the jury's award of future medical costs for John has a reasonable basis for computation and is not based upon mere speculation.

The jury awarded Cindi $360,000 for future economic loss, and the trial court upheld the award. According to the court, there was evidence from which the jury could have concluded Cindi was totally and permanently disabled and would be unable to achieve economic independence for the remainder of her life. The court suggested the award could be based on a working life of 36 years at a minimum salary of approximately $10,000 per year.

Peppermint Twist argues Cindi's own testimony repudiated the award for future loss of income in that she stated she was not claiming lost wages. It is clear from the context, however, that Cindi was referring to past wages, not future wages. Cindi testified she was not employed at the time of ingesting the lye. Furthermore, Peppermint Twist did not object when the plaintiffs requested an instruction for (and only for) future lost earnings for Cindi.

The nightclub also contends there was no evidence to support the award for future lost income. Peppermint Twist primarily relies upon Cindi's testimony that she wants to complete her GED and that she has considered taking vocational training in floral design, home design, or day-care. Prior to September 1989, Cindi intermittently worked various janitorial and cleaning jobs. The nightclub claims the evidence did not suggest her injuries would interfere with these "hypothetical future careers." Moreover, it is claimed there was no expert testimony that Cindi had a realistic expectation of future employment in any field other than her previous field. Peppermint Twist suggests Cindi's claim is speculative and indistinguishable from the plaintiff's claim of lost earning capacity in *Stang v. Caragianis*, 243 Kan. 249, 259-61, 757 P.2d 279 (1988), in which this court held the claim was too speculative to have been submitted to the jury because the plaintiff only had aspired to become a model and had not pursued such a career after the accident.

Peppermint Twist also asserts there was no evidence Cindi's injuries impaired her ability to clean houses or perform janitorial services. The nightclub claims the damages awarded here were based upon an abstract loss of ability to be employed gainfully. Peppermint Twist contends this alleged disability is nonpecuniary and should have been subject to the damage cap on pain and

suffering. In support, the nightclub cites *Kuhl v. Atchison, Topeka & Santa Fe Rwy. Co.*, 250 Kan. 332, 344, 827 P.2d 1 (1992), as expressly holding "that a general loss of the ability to perform work is an intangible element of loss, subject to damage caps." Peppermint Twist argues the issue is not whether the damages were appropriate for Cindi's losses, but "whether a pecuniary award for these losses can be sustained."

Presumably, Peppermint Twist is referring to the following language in *Kuhl*: "The verdict form and PIK Civ. 2d 9.01, Elements of Personal Injury Damage, make clear that the element of disability is categorized along with pain and suffering as non-economic/subjective." 250 Kan. at 344. PIK Civ. 2d 9.01 (1990 Supp.) provides in pertinent part:

"You shall determine the amount of damages sustained by the plaintiff. You should allow the amount of money which will reasonably compensate plaintiff for plaintiff's injuries and losses resulting from the occurrence in question including any of the following shown by the evidence:
a. Pain, suffering, disabilities, or disfigurement, and any accompanying mental anguish suffered by plaintiff to date (and those plaintiff is reasonably expected to experience in the future);

. . . .

c. Loss of time or income to date by reason of plaintiff's disabilities' (and that which plaintiff is reasonably expected to lose in the future . . .); and

. . . .

"In determining the amount of damages you should consider plaintiff's age, condition of health before and after, and the nature, extent and duration of the injuries. For such items as pain, suffering, disability, and mental anguish there is no unit value and no mathematical formula the court can give you. You should allow such sum as will fairly and adequately compensate plaintiff. The amount to be allowed rests within your sound discretion."

In the instant case, the jury instruction was identical to PIK Civ. 2d 9.01, except for changing the language to provide for more than one plaintiff. Peppermint Twist attempts to equate damages awarded for pain and suffering based upon a disability with damages awarded because of a diminished earning capacity based upon that disability. The argument is a subterfuge. The issue is whether the evidence supports the damages awarded for loss of future income.

There is evidence to support the jury's award. Elizabeth Anderson, who has her doctorate and is certified by the Kansas

Division of Workers Compensation as a rehabilitation counselor, testified for the defense. As a rehabilitation counselor, Dr. Anderson examines a client's medical records to ascertain what disability is involved, considers the psychological aspects of the disability, and then visits extensively with the client. The doctor verifies the client's achievements, academic and intellectual abilities, aptitudes, and interests before conducting performance tests.

Cindi spent three days with Dr. Anderson and her staff in April 1991. Because Cindi had ingested lye, the doctor advised her to seek an occupation that allowed her some flexibility and control over her routine. According to Dr. Anderson, Cindi has three strikes against her: lack of skills; fear of not meeting competitive standards, which the doctor concluded was related directly to the lye ingestion; and remediation and cultural factors that may be against her in the work environment. The concern about not meeting competitive standards is that Cindi must have frequent dilation and is sick and sore after these dilations. Because Cindi experiences this "discomfort," Dr. Anderson concluded Cindi would not be able to perform a job, even janitorial work, at an efficient and consistent pace and maintain quality performance.

Additionally, Dr. Lilly testified that if Cindi has the esophageal replacement surgery, she will have difficulties with a job that requires bending over because of the length of time it will take for food to reach her stomach.

" 'In reviewing an award for an objective element of damages such as loss of past and future income, an appellate court must look to the record to see if there is evidence to support the jury's calculation of pecuniary loss.' [Citation omitted.] In discussing how damages for loss of past and future income should be calculated, this court has observed that

'the extent of the diminution or impairment of earning capacity is a relevant consideration and is arrived at by comparing what the injured party was capable of earning at or before the time of the injury with what the party is capable of earning after the injury. This is recovery for injury to the capacity to earn and is relevant in calculating a party's loss of earnings.'

" 'In addition, in determining the amount to be awarded for decreased earning capacity, the jury should consider the health of the injured party and the party's physical ability to maintain herself before the injury, as compared with her condition in these respects afterward. [Citation omitted.]' " *Wahwasuck v. Kansas Power & Light Co.*, 250 Kan. 606, 618, 828 P.2d 923 (1992).

" 'The jury should award a fair and reasonable compensation, taking into consideration what the plaintiff's income would probably have been, how long it would have lasted, and all the contingencies to which it was liable. As bearing on these matters, the nature and extent of the plaintiff's business, profession, or employment, his skill and ability in his occupation or profession, the loss or diminution of his capacity to follow it, as a consequence of the injury, and the damages he has sustained by reason of such diminution may be shown and taken into consideration.' " *Morris v. Francisco*, 238 Kan. 71, 78, 708 P.2d 498 (1985).

The jury could have concluded that Cindi's earning capacity was impaired based upon Dr. Anderson's testimony, the serious nature of Cindi's injuries, and Cindi's health before and after ingesting the lye. There is a reasonable basis for calculating the $360,000 award: A 40-hour week at an hourly wage of $4.50, which is approximately minimum wage and the wage Cindi received at her last job prior to the injury, for 41½ years computes roughly to $360,000. Additionally, the Cotts point out the jury was instructed to take into account the economic value of Cindi's time that will be devoted to future medical treatment. Peppermint Twist did not object to that portion of the instruction.

The trial court upheld the $100,000 awarded to John for past and future loss of income. The court noted that John's annual income as a line crew supervisor for a utility was $30,000, that John could be expected to work 10 to 15 additional years, that John's injuries "could drastically affect his ability to perform his job," and that there was evidence it "was probable and to be expected" for John to suffer up to a five-year total income loss.

John's lost wages prior to trial totaled $2,100; he had missed approximately 21 days from work because of his injuries. Peppermint Twist claims the evidence does not support awarding John $97,900 for future loss of income ($100,000 total award minus $2,100 past lost earnings). Based upon John's testimony that his hourly wage was $17.01, the nightclub declares the damages awarded for loss of future income is the equivalent of 5,755 hours, 719 eight-hour days, 144 weeks, or nearly 3 years (actually 2¾ years) missed from work. According to Peppermint Twist, there was no evidence John's injuries impaired his earning capacity or limited his ability to perform his present job. The nightclub also claims there was no evidence John's

medical condition might deteriorate drastically, resulting in his absence from work.

John has been employed by KP&L since 1958 and is the foreman of a line crew. As troubleshooters, the crew regularly works around high voltage. In his capacity as foreman, John verbally supervises and communicates with the employees under his direction. John testified that losing his vocal cords would adversely affect his employment because he would not be able to communicate with the employees he supervises. If he should lose his vocal cords, John imagines he will be forced to retire. The ability to communicate is an important aspect of the job. Company policy does not compel retirement until an employee reaches the age of 70; therefore, John could work until November 2004, 13 years past the time of trial. John does not wish to retire before the mandatory age because he is helping take care of his youngest child, who is 13 years of age.

Dr. Anderson, the vocational counselor, also spent three days with John in April 1991. John reported to her that he believed something was wrong with his throat, that he had a serious belching problem, and that he worried the health problems caused by ingesting lye might force him to retire. The doctor discussed John's numerous job-related liabilities: his age; health problems predating the lye ingestion, such as suffering a stroke in 1962 and a seizure disorder; "a single work history of entry-level low-skill work"; extremely low academic abilities; low average intellectual ability; no transferable skills; a hearing impairment; and "a severe physical problem with the stomach, mouth, throat ulcers, and a requirement for dilation." Dr. Anderson acknowledged that only the last liability was related to lye ingestion, but referred to it as "the proverbial straw that broke the camel's back in relationship to his ability to work" and considered these physical problems a vocational liability. A voice change was detected in John, which the doctor believed could be a problem. She determined that, based upon John's job performance, his job was at risk.

Additionally, John testified he misses one or two days from work every time he visits the doctor.

There was evidence from which the jury could have concluded John's future earning capacity was diminished, but not totally impaired. The serious nature of John's injuries, his health before and

after the lye ingestion, and Dr. Anderson's testimony support the damages awarded.

The trial court did not abuse its discretion in refusing to grant Peppermint Twist's motion for remittitur or for a new trial.

## B. JURY INSTRUCTIONS

Peppermint Twist argues a new trial is warranted because the jury disregarded the trial court's instructions. In support of this argument, the nightclub directs our attention to *Kuhl v. Atchison, Topeka & Santa Fe Rwy. Co.*, 250 Kan. 332, 827 P.2d 1 (1992), and *City of Ottawa v. Heathman*, 236 Kan. 417, 690 P.2d 1375 (1984). In particular, Peppermint Twist relies upon the following language from *Heathman*:

"Where under all the facts and circumstances it is disclosed that the jury was confused in making findings and in awarding damages, or where a jury verdict manifests a disregard for the plain instructions of the court on the issue of damages, or arbitrarily ignores proven elements of damage, or indicates passion, prejudice or a compromise on the issue of liability and damages, the verdict should be set aside on motion for a new trial." 236 Kan. at 423.

Peppermint Twist claims that the "jury was confused about the court's instructions on fault" and that the "jury disregarded the plain instructions of the court concerning the assessment of damages." In an attempt to prove both claims, the nightclub submitted to the trial court an affidavit from Michael T. Buford, the jury foreman.

Peppermint Twist contends that because the jury did not find Ecolab at least partially negligent, the jury did not understand the fault instructions. In his affidavit, juror Buford stated the jury believed Ecolab's packaging and warnings about Eco-Klene were inadequate, but the jury was confused whether Ecolab could be held at fault. According to Buford, the jury did not understand the instructions that explained the conditions under which fault could be attributed to the manufacturer of Eco-Klene. Buford said the jury found Instruction No. 16, the strict liability instruction, confusing in that the jury believed Instruction No. 16 required the jury to find all five strict liability elements present before the jury could find Ecolab liable under any theory, including negligence. Because of this confusion, Buford authored a question on behalf of the jury. Buford claims that if the trial

court would have instructed the jury that Instruction No. 16 was not applicable to the theory of negligence, all jurors would have attributed "a substantial amount of fault" to Ecolab.

Buford's affidavit may not be used to impeach the verdict because the affidavit probes into the mental processes of the jury. Admissibility of evidence to test a verdict is governed by statute. K.S.A. 60-444(a) provides that if the validity of a verdict is in question a juror may testify "as a witness to conditions or occurrences either within or outside the jury room" except as limited by K.S.A. 60-441. K.S.A. 60-441 specifies that "no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

"Under these statutes we have held that a juror may not impeach his or her verdict on any ground inherent in the verdict itself; a juror may not divulge what considerations personally influenced him or her in arriving at the verdict or what reasoning personally led him or her to the final decision. *State v. Taylor*, 212 Kan. 780, 512 P.2d 449 (1973). More recently in *Crowley v. Ottken*, 224 Kan. 27, 31, 578 P.2d 689 (1978), it was pointed out that evidence is not admissible under K.S.A. 60-441 if it only pertains to the reasons a juror joined in the verdict. To be admissible the evidence must relate to extrinsic misconduct or to physical facts or occurrences within or without the jury room." *Verren v. City of Pittsburg*, 227 Kan. 259, 260, 607 P.2d 36 (1980).

"The mental process of a juror in reaching a verdict or the factors which influence the mental process cannot be inquired into for the purpose of impeaching a verdict. Public policy forbids the questioning of a juror on these matters for a very obvious reason, *i.e.*, there is no possible way to test the truth or veracity of the answers." *Saucedo v. Winger*, 252 Kan. 718, 729, 850 P.2d 908 (1992).

See *Crowley v. Ottken*, 224 Kan. 27, 31, 578 P.2d 689 (1978) (juror's affidavit to impeach verdict inadmissible; affidavit "did not relate to extrinsic misconduct or to physical facts or occurrences within or without the jury room but only to the reasons she joined in the verdict"); *Smith v. Union Pacific Railroad Co.*, 214 Kan. 128, 134-35, 519 P.2d 1101 (1974) (trial court properly excluded juror's affidavit that stated jury "instructions were not clear and were confusing to some of the jurors").

Even if the merits of Peppermint Twist's contention are addressed, the trial court did not abuse its discretion in refusing to grant a new trial. The question submitted to the trial court reads as follows: "In Instruction No. 16, do we have to find all five conditions true to find Ecolab with any damages?" After considerable input from the attorneys, the trial court responded: "Yes, but the Defendant Peppermint Twist has presented an alternate theory of liability, to wit, negligence." In denying Peppermint Twist's motion for a new trial, the trial court determined the jury was instructed, both adequately and correctly, on the possibility of finding Ecolab negligent. The court concluded: "There can be no question the jury could have, and knew it could have, found Ecolab negligent."

Instruction No. 16 begins, "You may assess fault against Ecolab, Inc., for plaintiffs' injuries provided you find the following from the evidence" and then lists the five elements of strict liability. Instruction No. 14 specifies that Peppermint Twist has asserted two theories why Ecolab "should be found at fault, one based upon negligence and the other based upon strict liability." The instruction then expressly and separately sets forth Peppermint Twist's negligence and strict liability theories against Ecolab. Instruction No. 14 concludes by explaining that Peppermint Twist has the burden of proving Ecolab's fault under either theory and that subsequent instructions will guide the jury in making this determination. Instruction No. 31 directed the jury to make its determination "on the basis of comparative fault of the parties." The instruction also defined negligence and explained: "A party is at fault when he or she is negligent, strictly liable or has breached an express warranty; and that negligence, strict liability or breach of express warranty has caused or contributed to the event which brought about the injury or damages for which claim is made." The instructions, read as a whole, and the trial court's response to the jury question make it clear the jury could have found Ecolab negligent. We do not find reversible error on this issue.

Peppermint Twist's next contention is that the jury disregarded the trial court's instructions about assessing damages and arrived at a quotient verdict, which amounts to jury misconduct. "A quotient verdict is one in which the jurors agree in advance to

return as their verdict the amount obtained by averaging the figures each juror records as his verdict and subsequently return a verdict that is the direct product of such an agreement." *Johnson v. Haupt*, 5 Kan. App. 2d 682, Syl. ¶ 4, 623 P.2d 537 (1981); see *Merando v. A.T. & S.F. Rly. Co.*, 232 Kan. 404, 407-10, 656 P.2d 154 (1982); *Hogue v. Kansas Power & Light Co.*, 212 Kan. 339, 344-46, 510 P.2d 1308 (1973). "Upon an allegation that a jury returned a quotient verdict, narrow questions may be directed to the jurors to determine whether they agreed in advance to be bound by an averaging technique." *Johnson*, 5 Kan. App. 2d 682, Syl. ¶ 6.

The nightclub claims the irregularity of the damage verdicts is apparent from the verdict because the sums awarded are not traceable to the evidence and because the jury used "a round figure 'target.' " Again, Peppermint Twist relies upon juror Buford's affidavit. Buford stated that the jury determined damages by beginning with the maximum allowable damages and then decreasing the amount until the requisite 10 jurors agreed; that the jury then allocated the total amount between the three categories of pain and suffering, medical costs, and lost wages; that there was no rigorous attempt to calculate medical costs and lost wages; and that the amount for the third category was arrived at by simply subtracting the other two categories from the total award. According to Peppermint Twist, the jury erred not only in failing to answer each category of damages, but also in agreeing upon general damage verdicts and then deliberating only to the extent necessary to come up with artificial amounts for the special verdict form that added up to a predetermined general verdict.

Again, we need not address the merits of Peppermint Twist's contention. Buford's affidavit probes into the mental processes of the jury and may not be used to overthrow the verdict. See *Merando*, 232 Kan. at 410 (trial court properly excluded juror affidavit concerning the method by which the jury arrived at its verdict); *Verren*, 227 Kan. at 262-63 (juror testimony admissible to show "a conscious conspiracy by the members of the jury to disregard and circumvent the instructions on the law given by the court"); *Gannaway v. Missouri-Kansas-Texas Rld. Co.*, 2 Kan. App. 2d 81, 84, 575 P.2d 566 (1978) (juror testimony that jury disregarded instructions permissible only if it is "apparent from

the verdict itself that the jury had misunderstood or disregarded the instructions"). Buford's affidavit does not establish a conscious conspiracy. Additionally, the alleged irregularity of the damages awarded is not apparent from the verdict. As previously discussed, the sums awarded are traceable to the evidence. The fact the jury awarded rounded-off sums is not in and of itself evidence of irregularity.

The trial court did not abuse its discretion in refusing to grant Peppermint Twist's motion for a new trial based upon alleged jury misconduct.

## II. COLLATERAL SOURCE BENEFITS

Peppermint Twist argued the trial court erred in failing to apply the Collateral Source Benefits Act, K.S.A. 1992 Supp. 60-3801 *et seq.*, and in not allowing the nightclub to introduce evidence of the Cotts' settlements with Ecolab. At oral argument on May 28, 1993, Peppermint Twist conceded there was no error, based upon a decision we filed on April 16, 1993. In *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1024, 850 P.2d 773 (1993), this court held unconstitutional the Collateral Source Benefits Act.

## III. NONUNANIMOUS VERDICT

Peppermint Twist argues that K.S.A. 1992 Supp. 60-248(g), which permits a verdict when 10 of 12 jurors agree, is unconstitutional. The statute provides, in pertinent part: "Whenever the jury consists of 12 members, the agreement of 10 jurors shall be sufficient to render a verdict. In all other cases, subject to the stipulation of the parties as provided in subsection (a), the verdict shall be by agreement of all the jurors."

The Cotts maintain the jury instructions and verdict forms Peppermint Twist initially proposed agreed to 10, 11, or 12 jurors concurring in the verdict. Subsequently, based upon *State v. Roland*, 15 Kan. App. 2d 296, 807 P.2d 705 (1991), a criminal decision, Peppermint Twist argued a 10-2 verdict was unconstitutional unless all litigants consented to nonunanimity and Peppermint Twist was withdrawing its consent. The trial court overruled the nightclub's objections to a less than unanimous verdict.

In denying Peppermint Twist's motion for a new trial, the trial court found that a nonunanimous verdict was not grounds for a

new trial. The court noted the nightclub had cited no authority for its claims that the Kansas Constitution requires unanimous verdicts in all trials and that the law requiring unanimous verdicts in criminal trials is applicable to civil trials.

On appeal, Peppermint Twist claims a nonunanimous verdict, as authorized by 60-248(g), violates § 5 of the Kansas Constitution Bill of Rights and is in conflict with K.S.A. 60-238 and K.S.A. 60-239. See Kan. Const. Bill of Rights, § 5 ("The right of trial by jury shall be inviolate."); K.S.A. 60-238 (the right of a jury trial shall be preserved; a litigant may demand a jury trial, but if the demand is not served, the right is deemed waived); K.S.A. 60-239 (when and what issues are triable by jury or by trial court). To support this claim, Peppermint Twist cites *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990), and *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988), for authority to apply a quid pro quo analysis, which the nightclub divides into three parts. Peppermint Twist claims the statute must meet 14th Amendment due process requirements, must be reasonably necessary to and promote the public's general welfare, and must provide an adequate substitute for the constitutional right impaired.

Peppermint Twist's three-part test does not agree with our understanding of quid pro quo analysis. Whether an adequate substitute remedy exists is part of the due process analysis. In *Samsel*, this court stated:

"The legislature can modify the right to a jury trial . . . , but the legislature's right is not absolute. Statutory modification of the common law must meet due process requirements and be reasonably necessary in the public interest to promote the general welfare of the people of the state. Due process requires that the legislature substitute the viable statutory remedy of quid pro quo (this for that) to replace the loss of the right." 246 Kan. at 358.

For a general discussion of quid pro quo analysis, see Note, *Testing the Constitutionality of Tort Reform with a Quid Pro Quo Analysis: Is Kansas' Judicial Approach an Adequate Substitute for a More Traditional Constitutional Requirement?*, 31 Washburn L.J. 314 (1992).

The first question that must be addressed is whether the right to a jury trial in civil cases under the common law includes the

right to a unanimous verdict. Only if a common-law right has been abrogated must this court determine whether the legislature has provided an adequate substitute remedy, that is, whether a quid pro quo exists.

Although a state constitutional issue is raised, federal constitutional interpretation of the alleged common-law right provides guidance. *Apodaca v. Oregon*, 406 U.S. 404, 32 L. Ed. 2d 184, 92 S. Ct. 1628 (1972), involved a challenge to an Oregon statute that permitted nonunanimous verdicts in all criminal cases except first-degree murder. After noting that the unanimity requirement originated in the Middle Ages and by the 18th century had become an accepted aspect of the common-law jury trial, the Supreme Court commented that " 'the relevant constitutional history casts considerable doubt on the easy assumption . . . that if a given feature existed in a jury at common law in 1789, then it was necessarily preserved in the Constitution.' [Citation omitted.]" 406 U.S. at 408-09. The Court discussed the conflicting inferences that could be drawn from the fact the framers of the Constitution eliminated earlier references to unanimity and to the "accustomed requisites" in the context of the right to a jury trial. Concluding that historical considerations would not resolve the issue, the Court then focused upon the jury's function in contemporary society. The Court stated: " '[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen . . . .' [Citation omitted.] A requirement of unanimity, however, does not materially contribute to the exercise of this commonsense judgment." 406 U.S. at 410. The views of all jurors, even those representing minority viewpoints, will be heard during deliberation. It cannot be assumed "the majority of the jury will refuse to weigh the evidence and reach a decision upon rational grounds, just as it must now do in order to obtain unanimous verdicts." 406 U.S. at 413. The Court held that the federal constitution does not require unanimous verdicts.

Peppermint Twist acknowledges the United States Constitution does not require unanimous jury verdicts, but argues "the right to a jury trial in common law civil cases in Kansas is *more extensive* than the rights guaranteed by the United States Constitution." See *Samsel*, 246 Kan. at 351; *Schultz v. Kansas Gas &*

*Electric Co.*, 7 Kan. App. 2d 500, 502, 644 P.2d 484 (1982). The nightclub contends Kansas historically has required unanimity under our Bill of Rights. See *Barker v. Railway Co.*, 89 Kan. 573, 577, 132 Pac. 156 (1913) (In a case involving fire damage to an apple orchard, this court stated that the 12 jurors' "unanimous opinion as to the essential facts of the case as well as to the general result must be in favor of the prevailing party."); *Maduska v. Thomas*, 6 Kan. *153, Syl. ¶ 3 (1870) (In a case involving a contract for the sale of land, this court held: "A verdict of any less number than twelve jurors, is not a verdict of the jury.").

A careful review of the cases cited reveals flaws in Peppermint Twist's argument. In *Schultz*, the Court of Appeals acknowledged more than the federal constitution not requiring unanimous verdicts. The *Schultz* court stated:

"Historically, the right to a jury was interpreted to include the right to the unanimous verdict of a twelve-member panel. However, it has been determined that neither the number of persons necessary to compose a jury (*Williams v. Florida*, 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893 [1970]), nor the proportion of the jury which must concur in the verdict (*Apodaca v. Oregon*, 406 U.S. 404, 32 L. Ed. 2d 184, 92 S. Ct. 1628 [1972]), is constitutionally specified and unalterable by state statute." 7 Kan. App. 2d at 502.

Peppermint Twist fails to discuss the context in which the *Samsel* court discussed our broader Kansas rights to a jury trial. The *Samsel* court stated:

"The United States Supreme Court has determined that the guarantee of a jury trial under the 7th Amendment is limited and does not extend to the remedy phase of a civil trial. We have interpreted our constitution as granting broader rights to the citizens of this state. The state constitution and the Kansas common law recognize that the right to a jury trial includes the right to have the jury determine damages." 246 Kan. at 351.

Peppermint Twist does not argue framer intent or express language in the Kansas Constitution requires unanimous verdicts. Nor can it. "No express Kansas constitutional language requires jury unanimity nor does clear evidence of framer intent exist. Past references to a preserved common-law jury right have been by implication or assumption." Note, *Civil Juries: Recent Legislation Allowing Nonunanimous Verdicts*, 18 Washburn L.J. 269, 286 (1979). The legislature enacted the nonunanimous verdict

provision in 1978, after the *Apodaca* decision. See L. 1978, ch. 226, § 1(g).

A related issue, whether a litigant is entitled to a jury of 12, also provides guidance. In *Williams v. Florida*, 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893 (1970), the challenge was to a Florida statute that allowed six-member juries in all but capital cases. The United States Supreme Court reviewed the historical development of trial by jury and concluded that fixing the jury panel at 12 members was "a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance 'except to mystics.' [Citation omitted.]" 399 U.S. at 102. The Court discussed the "elusive" framers' intent and then turned to the function and purpose of a 12-member jury in relationship to a jury trial. It was reasoned the precise number was not the important factor, but "the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility of obtaining a representative cross-section of the community." 399 U.S. at 100. The United States Supreme Court held that a 12-member jury "is not a necessary ingredient of 'trial by jury.' " 399 U.S. at 86.

Kansas has addressed a similar issue, but not in the context of whether the constitutional right to a jury trial includes the right to a 12-member panel. In fact, based upon the *Williams* decision, the parties in *Bourne v. Atchison, T. & S. F. Rly. Co.*, 209 Kan. 511, 497 P.2d 110 (1972), did not raise any constitutional challenges. *Bourne* was a wrongful death case in which the defendant's request for a 12-member jury was denied on the basis of a local court rule. This court did not invalidate the local rule, but found error in the trial court's interpretation and application of the local rule. In the absence of a stipulation, this court determined the trial court violated K.S.A. 1971 Supp. 60-248(a), which provided: "The parties may stipulate that the jury shall consist of any number less than twelve (12) or that a verdict or a finding of a stated majority of the jurors shall be taken as the verdict or finding of the jury." 209 Kan. at 513. We held:

"The right of trial by jury is a substantial and valuable right. The law favors trial by jury, and the right should be carefully guarded against infringements."

"The state has an interest in the subject of trial by jury as a matter of public policy. The state has declared its policy on the subject not only by the decisions of its courts but also through acts of the legislature."

"The legislature may make any reasonable regulations as to the practice and procedure in civil cases involving jury trials as long as the right to a jury trial is not materially impaired."

"The legislature has the power to regulate the number of jurors required in civil cases in district courts." 209 Kan. 511, Syl. ¶¶ 1-4.

In *Palmer v. Ford Motor Company*, 498 F.2d 952 (10th Cir. 1974), the Tenth Circuit Court of Appeals addressed the constitutional question of whether the Kansas Constitution entitled a litigant to a jury of 12. After reviewing prior Kansas law, including *Bourne*, the Court of Appeals concluded "that in Kansas the right to a 12-man jury is not a matter of substantive law but is subject to regulation by the legislature, the local courts, and the parties to the specific case." 498 F.2d at 954. The court then noted Kansas law was consistent with federal decisions.

We hold the Kansas constitutional right to trial by jury does not include the right to a unanimous verdict in civil cases. That being so, we need not proceed further with the quid pro quo analysis.

Peppermint Twist also argues a nonunanimous verdict is "utterly irrational and wholly unrelated to the administration of justice consistent with honesty and due process." Peppermint Twist points out K.S.A. 1992 Supp. 60-248(g) has been interpreted to permit nonunanimous verdicts only if a jury of 12 is impaneled. See *Schultz*, 7 Kan. App. 2d 500, Syl. ¶ 3. The nightclub contends there is no rational basis for permitting a verdict if 10 out of 12 jurors agree, but not if 10 out of 11 jurors agree. Therefore, Peppermint Twist claims the nonunanimous verdict provision of 60-248(g) does not promote any worthwhile concerns, such as avoiding mistrials, which waste public resources. According to the nightclub, the practical result of allowing nonunanimous verdicts is that plaintiffs are relieved of their substantive burden of proof. The nightclub also suggests juries in cases involving non-unanimous verdicts will not carefully evaluate the evidence and will avoid resolving differences of opinion because they are not required to continue to deliberate.

"If a statute is attacked as violating due process, the test is whether the legislative means selected have a real and substantial relation to the objective

sought. This rule has been restated in terms of whether the statute is reasonable in relation to its subject and is adopted in the interest of the community."

"A statute comes before the court cloaked in a presumption of constitutionality, and it is the duty of the party attacking the statute to sustain the burden of proof." *Peterson v. Garvey Elevators, Inc.*, 252 Kan. 976, Syl. ¶¶ 2, 4, 850 P.2d 893 (1993).

The Cotts contend K.S.A. 1992 Supp. 60-248(g) was enacted because of the backlog of civil cases, the expense of litigation, and the erosion of public confidence in the judicial system. According to the Cotts, the nonunanimity provision helps to reduce court congestion, reduce the cost of retrying cases when one or two jurors disagree, and promote finality in litigation. The argument is persuasive. Most states view nonunanimous verdicts in civil cases as a means to increase "court efficiency without sacrificing jury trial safeguards" and to preserve "public confidence." Note, *Civil Juries: Recent Legislation Allowing Nonunanimous Verdicts*, 18 Washburn L.J. at 273.

## IV. COMPARATIVE FAULT

Peppermint Twist argues it did not have a fair opportunity to prove Ecolab's comparative fault. In support of its argument, the nightclub advances three reasons: The trial court placed "unreasonable restrictions" on discovery. The trial court permitted "improper evidence and argument" at trial that enhanced the nightclub's fault and minimized the manufacturer's fault. The trial court improperly instructed the jury on the standard for assessing liability against Ecolab. The nightclub claims these errors entitle it to a new trial on all issues or, preferably, to the entry of a defense verdict.

### A. DISCOVERY

Peppermint Twist argues its discovery against Ecolab was restricted unreasonably because the trial court failed to enforce discovery orders. The Cotts filed suit against Peppermint Twist, and pursuant to K.S.A. 1992 Supp. 60-258a(c), the nightclub added Ecolab as an additional party for purposes of fault comparison. The Cotts then modified their petitions to add claims against Ecolab. According to Peppermint Twist, it had to file motions to compel discovery because Ecolab was uncooperative. The nightclub claims the trial court then directed Ecolab to co-

operate and ordered additional discovery. Peppermint Twist contends that before the additional discovery was completed, the Cotts settled with Ecolab. Thereafter, the nightclub alleges the trial court refused to enforce the discovery orders, which "substantially prejudiced" the nightclub's ability to prove Ecolab had been at fault.

The nightclub claims the outstanding discovery concerned evidence of similar occurrences. Citing *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 671 P.2d 491 (1983), Peppermint Twist maintains evidence of similar occurrences "is admissible to prove notice of defect and to prove fault." See *Powers*, 234 Kan. at 98 ("Evidence of prior similar accidents is admissible to prove foreseeability."). Because discovery was thwarted and the trial court refused to make a record of documents inspected in camera, Peppermint Twist contends it is impossible to know how seriously its rights were prejudiced.

Peppermint Twist also asserts that the basis for the trial court's refusal to enforce the discovery orders was the court's conclusion that it had no jurisdiction over Ecolab once the Cotts and Ecolab entered into the settlements. Citing *Gaulden v. Burlington Northern, Inc.*, 232 Kan. 205, 654 P.2d 383 (1982), and *Wilson v. Probst*, 224 Kan. 459, 581 P.2d 380 (1978), the nightclub argues the status of an additional party under 60-258a is determined by the presence or absence of the defendant's claim of comparative fault and not by whether the plaintiff has a claim against the additional party. Peppermint Twist concludes by claiming that a party joined under 60-258a(c) has the same status as a party joined under K.S.A. 60-214 (third-party practice), K.S.A. 60-219 (joinder of persons needed for adjudication), or K.S.A. 60-224 (intervention) and that only the court can dismiss a party. The nightclub maintains that because the trial court never entered an order of dismissal against Ecolab, the manufacturer was bound to comply with the discovery orders.

"The control of discovery is entrusted to the sound discretion of the trial court and orders concerning discovery will not be disturbed on appeal in the absence of a clear abuse of discretion." *Evans v. Provident Life & Accident Ins. Co.*, 249 Kan. 248, Syl. ¶ 9, 815 P.2d 550 (1991). "[T]he admission of evidence of prior acts or occurrences is committed to the sound discretion of the

trial court and will be overturned on appeal only upon a showing of abuse." *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 66, 755 P.2d 1319 (1988).

The trial court explained its discovery rulings in its memorandum of decision denying Peppermint Twist's motion for a new trial, stating:

"The alleged failure of the Court to require Ecolab to make timely and comprehensive discovery is a song that has been sung often and aggressively by counsel for Peppermint Twist. . . . Certainly discovery can be abused by requesting too much as well as by giving too little. In this case an entire piece of new and separate litigation was developed between Ecolab and Peppermint Twist over discovery. The Court was concerned about when, if at all, the Plaintiffs' cases would get to trial. A halt had to be called in the interest of justice."

A summary of Peppermint Twist's discovery against Ecolab included 30 depositions, 8 requests for production of documents, and 4 sets of interrogatories.

With regard to discovery of prior incidents of ingestion, the trial court expressed its reluctance to allow discovery on this sensitive, potentially privileged, and prejudicial (to Ecolab) material, which may not have even been admissible. The court noted that when this became an issue, discovery essentially was complete. The trial court decided to allow discovery of two prior incidents and precluded discovery of two other incidents. Evidence of one prior incident was introduced at trial, the result of an informal agreement between counsel: Peppermint Twist wanted the evidence admitted to show fault on Ecolab's part, but agreed not to pursue other incidents. The Cotts agreed to the evidence because of the medical issues. The trial court found this agreement did not prejudice Peppermint Twist.

A reasonable person would agree with the trial court's discovery rulings. Peppermint Twist has failed to show the trial court's rulings were arbitrary, fanciful, or unreasonable. See *In re Marriage of Soden*, 251 Kan. 225, Syl. ¶ 9, 834 P.2d 358, *cert. denied* ___ U.S. ___, 121 L. Ed. 2d 540 (1992). The trial court's rulings on discovery do not amount to reversible error.

## B. PRETRIAL ORDER

Peppermint Twist asserts fault issues outside the scope of the pretrial order were improperly injected at trial. The nightclub

maintains the Cotts exceeded the scope of the pretrial order by introducing evidence of the nightclub's alleged violations of KDHE and OSHA regulations to rebut the nightclub's claim of comparative fault against Ecolab. The Cotts dismissed their negligence and strict liability claims prior to trial. Another problem, according to Peppermint Twist, is that because this evidence was outside the scope of the pretrial order, the evidence was in actuality rebuttal evidence and the Cotts introduced it in their case in chief. The nightclub alleges it objected to the introduction of this evidence, but neglects to support this claim by citing to the record. Thus, we can assume there is no evidence in the record to support the claim.

In any event, contrary to the nightclub's assertion, the Cotts did not raise new fault issues. Although the pretrial order does not list negligence per se as a theory, the contested facts identified in the order address whether Peppermint Twist violated KDHE and OSHA regulations. The Cotts maintain this contested evidence concerning the nightclub's allegedly negligent acts was admissible because the evidence related to foreseeability, including what uses reasonably could be anticipated. The contested evidence is not rebuttal evidence.

Peppermint Twist also contends "the jury was left to drift" because the instructions read to the jury did not explain which party had the burden of proof on the additional fault issues the Cotts injected to mitigate Ecolab's fault. Therefore, according to the nightclub, the jury did not understand what part, if any, the evidence concerning regulation violations played in determining fault. Peppermint Twist acknowledges a supplemental instruction on the Cotts' burden of proof was given, but maintains the instruction was "vague." Furthermore, according to the nightclub, this instruction was never put in writing and submitted to the jury with the other instructions. After the trial court instructed the jury, counsel for Peppermint Twist requested an additional instruction on the Cotts' burden of proof. The trial court then instructed the jury that the plaintiffs have the burden of proving Peppermint Twist caused the incident and of establishing damages. A written version of this instruction follows the other instructions in the record on appeal. The instructions, taken as a

whole, are not vague. See *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, Syl. ¶ 5, 837 P.2d 330 (1992).

Finally, Peppermint Twist declares that considering "the totally confused sequence of presentation of the evidence and jury instructions," it is not surprising the jury was confused, as attested to by juror Buford's affidavit. As previously discussed, Buford's affidavit is not admissible evidence. The Cotts dispute the night-club's suggestion that the jury misapplied this evidence and used it to find Peppermint Twist negligent. Because the jury was directed to find fault against Peppermint Twist under a breach of express warranty claim, the Cotts contend the only way the jury could use this evidence was in connection with determining Ecolab's fault.

Peppermint Twist has no legal or factual basis for reversal on this issue.

### C. JURY INSTRUCTIONS ON FAULT

Peppermint Twist contends five different jury instructions pertaining to assessment of fault were clearly erroneous. With regard to these alleged errors, the nightclub does not bother with references to the record on appeal.

"If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *Cerretti*, 251 Kan. at 355.

Peppermint Twist contends it was clearly erroneous not to instruct the jury that Ecolab should be held to the standard of an expert regarding the risks and hazards the product poses. Citing *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984), the nightclub contends this standard is the law in Kansas for product manufacturers. The *Wooderson* court specifically held this to be the standard of constructive knowledge for drug manufacturers. 235 Kan. 387, Syl. ¶ 6. More importantly, as the Cotts point out, is that Peppermint Twist fails to show the lack of instruction prejudiced it. Additionally, the Cotts assert that Ecolab's knowledge about the risks of its product or lack thereof was not an issue at trial.

The nightclub maintains the trial court erred in instructing the jury that failure to heed reasonable warnings is always negligence because there was no negligence claim against it. Error also is alleged in the trial court's refusal to instruct that product warnings must be heeded only to the extent an ordinary person would follow them. Citing *Wooderson*, 235 Kan. at 410, the Cotts assert the instruction was correct because this court has recognized " 'a presumption that an adequate warning would be heeded.' " See Restatement (Second) of Torts § 402A, comment j (1964). Regardless, the nightclub does not establish the instruction given and the one refused were prejudicial.

During deliberation, the jury asked the trial court to clarify the word "defective" in relationship to the product. The court directed the jurors to use their common understanding of the word and reminded the jury the word was illustrated in Instruction No. 15. That instruction informed the jury that "[a] product is in a defective condition, if, at the time it leaves the manufacturer's hands, it is in a condition which is unreasonably dangerous to the ordinary user." Peppermint Twist alleges it was clearly erroneous not to use the "legal test," but never explicitly sets forth the legal test. Again, the nightclub does not explain how the trial court's explanation misled the jury. Additionally, "[j]ury instructions are to be considered together and read as a whole, without isolating any one instruction." *Cerretti*, 251 Kan. at 355. The court's response, coupled with its reference to Instruction No. 15, is not clearly erroneous.

The discussion of the previous issue disposes of Peppermint Twist's fourth allegation of error, that the trial court erred in instructing on theories beyond the scope of the pretrial order without identifying the party with the burden of proof.

The nightclub's final complaint is that the law and the evidence in this case do not support an instruction that the nightclub made and breached express warranties. Citing K.S.A. 84-2-313, Peppermint Twist argues that an express warranty exists only if "an affirmation of fact or description becomes the basis of the bargain" and that an express warranty is not created by mere endorsement of the product. Here, according to the nightclub, there was error because the cocktail waitress' comments were "mere commendation" and because the Cotts did not purchase the drinks and

the friend who bought the drinks did not hear the waitress' comments. The Cotts disagree, arguing the waitress' comments established an express warranty. See *Naaf v. Griffitts*, 201 Kan. 64, Syl. ¶ 1, 439 P.2d 83 (1968) ("An express warranty is created by any direct and positive affirmation of fact made by the seller concerning the article to be sold during sale negotiations and as part of the contract upon which the seller intends the buyer to rely in making the purchase."). The Cotts also dispute Peppermint Twist's contention that they were not buyers, pursuant to K.S.A. 84-2-313, because they did not pay for the drinks. The Kansas Comment 1983 to K.S.A. 84-2-103 explains that a buyer includes someone who receives goods under a preexisting contract. The instruction was not clearly erroneous.

None of the alleged errors warrant reversal. The instructions or lack thereof are not clearly erroneous.

## V. COMPARATIVE FAULT PRINCIPLES

The Cotts raise two issues on cross-appeal. Their first argument centers on whether comparative fault principles are applicable in a breach of express warranty case. Specifically, the Cotts claim the trial court erred in allowing the jury to compare Peppermint Twist's fault with the alleged fault of Ecolab. The Cotts maintain the error was not harmless because if the trial court had stricken that defense, the discovery, pretrial, trial, and appeal issues would have been narrowed.

Although comparative fault principles were applied in this case, the Cotts prevailed at trial. The jury found Peppermint Twist, the defendant, 100 percent at fault and Ecolab, which was not a party, zero percent at fault. The Cotts do not suggest this court grant them a new trial because comparative fault principles were applied. The only remedy the Cotts request is that this court direct the trial court not to instruct the jury on comparative fault in the event of a new trial. This issue is moot.

## VI. STATUTORY CAPS

For their second issue on cross-appeal, the Cotts argue the trial court erred in applying K.S.A. 1992 Supp. 60-19a02 to this breach of express warranty case and thereby reducing their awards for pain and suffering to $250,000 each. The statute provides, in pertinent part:

"(a) As used in this section 'personal injury action' means any action seeking damages for personal injury or death.

"(b) In any personal injury action, the total amount recoverable by each party from all defendants for all claims for noneconomic loss shall not exceed a sum total of $250,000."

Citing *Weathers v. American Family Mut. Ins. Co.*, 777 F. Supp. 879 (D. Kan. 1991), as authority, the Cotts argue the statutory cap only applies to negligence claims. Because the instant case involved a breach of express warranty, the Cotts ask this court to restore the jury's original verdicts for pain and suffering— $1,040,000 for Cindi and $570,000 for John.

The plain language of K.S.A. 1992 Supp. 60-19a02 requires noneconomic damage awards be capped at $250,000 in *personal injury actions*, which are defined as "any action seeking damages for personal injury or death." In other words, the statutory cap is applicable to any suit, including breach of express warranty, in which personal injuries are claimed, as in the case at bar.

Additionally, the rationale underlying the *Weathers* decision is not persuasive. In *Weathers*, a diversity case applying Kansas law, the issue was whether the statutory cap contained in K.S.A. 1992 Supp. 60-19a01 applies to claims of malicious prosecution or outrage. K.S.A. 1992 Supp. 60-19a01 applies only to causes of action accruing between July 1, 1987, and July 1, 1988, whereas 60-19a02 applies to causes of action accruing on or after July 1, 1988. K.S.A. 1992 Supp. 60-19a01(f); K.S.A. 1992 Supp. 60-19a02(f). The language of subsections (a) and (b) of 60-19a02 is identical to the language of subsections (a) and (b) of 60-19a01, except 19a02(b) replaces the term "pain and suffering" with "noneconomic loss." Noneconomic loss is the broader term, including "claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity; and losses which cannot be easily expressed in dollars and cents. [Citation omitted.]" *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 352, 789 P.2d 541 (1990).

In *Weathers*, Chief Judge Earl E. O'Connor relied upon the *Samsel* decision, in which the constitutionality of 60-19a01 and 60-19a02 was upheld. Chief Judge O'Connor stated:

"Although the [Kansas Supreme Court] did not expressly discuss the scope of section 60-19a01 in *Samsel*, the opinion does suggest that the court would

limit application of the statute to negligence actions. Throughout the opinion are numerous references to 'negligence,' 'negligent act,' 'negligent tortfeasor,' and 'negligence actions.' *Id.* at 354, 355, 358, 361, 364, 365, 366, 368, 369, 789 P.2d 541. These references, read in light of the court's discussion of the history of the statute, lead us to the inevitable conclusion that section 60-19a01 was not intended to apply to cases in which the tortfeasor's actions have gone beyond negligence. Because insurance coverage is simply not available for intentional torts, application of section 60-19a01 in intentional tort cases would do nothing to further the legislature's intention of easing insurance rates and ensuring the continued availability of liability insurance. Similarly, application of section 60-19a01 in such cases would do nothing to speed or ensure recovery by victims of intentional torts. Aside from these factors, the court finds nothing in the language of the statute or in the *Samsel* opinion to indicate that the Kansas legislature intended to deny full recovery to victims of intentional torts. Accordingly, the court concludes that section 60-19a01 is inapplicable to plaintiff's malicious prosecution claim.

"Even assuming, *arguendo*, that intentional torts are included within the scope of section 60-19a01, the court would conclude that the statute is inapplicable to the instant case. Subsection (b) of the statute refers to damages for 'pain and suffering.' K.S.A. 60-19a01(b). Although this term is not defined in the statute, the court agrees with plaintiff that the term 'refers to the misery associated with physical injury and not to the emotional distress experienced by plaintiff as a result of malicious prosecution.' " 777 F. Supp. at 881.

For the reasons stated above, the judge also refused to apply 60-19a01 to plaintiff's claim of outrage. 777 F. Supp. at 881 n.2.

Peppermint Twist disagrees with Chief Judge O'Connor's interpretation of *Samsel*. The nightclub contends the *Samsel* court did not limit damage caps to negligence actions. We agree.

Most of this court's use of the term negligence and similar phrases in *Samsel* are in the context of discussing other cases. See 246 Kan. at 354, 355, 361. Another use of negligence was this court's restating of one of the defendant's arguments. See 246 Kan. at 354. The other use of negligence in the majority opinion is as follows: "Our constitution provides that the common-law right to a jury trial includes the right to have the jury determine the amount of the damages in personal injury actions. An individual does not, however, have a vested right in the common-law rules governing negligence actions." 246 Kan. at 358. The remaining references cited in the *Weathers* opinion are found in the separate concurring and dissenting opinions in *Samsel*. See 246 Kan. at 364, 365, 366, 368, 369. The context in which the

*Samsel* cause of action arose, that being negligence, also must be taken into account. 246 Kan. at 345. Read as a whole, the *Samsel* decision does not restrict, either expressly or impliedly, application of damage caps to negligence actions. The key phrase is "personal injury action" as defined in the statute. The case before us clearly fits the definition of "any action" for recovery for "personal injury."

The trial court did not err in applying the statutory cap to the instant case.

Affirmed.