(174 P.3d 432)
No. 96,198

CLARISSA M. KENDRICK, *Appellee*, v. RAVI K. MANDA, *Appellant*.

Opinion filed January 11, 2008.

*David M. Druten*, of Coates & Logan, LLC, of Overland Park, for appellant.

*David Curotto*, of Law Office of David Curotto, LLC, of Olathe, for appellee.

Before GREENE, P.J., MCANANY, J., and LARSON, S.J.

MCANANY, J.: Ravi Manda appeals an adverse judgment in a personal injury action. The jury found that Clarissa Kendrick sustained damages of $70,990.40 for which Manda was 70% at fault.

Manda challenges the court's instructions to the jury, the sufficiency of the evidence to support a finding of negligence, and Kendrick's claimed future medical expenses.

The automobile-bicycle collision which prompted this suit occurred at the T intersection where 139th Street meets Mur-Len Road in Olathe. 139th Street approaches from the east and meets Mur-Len, which runs north and south. At this intersection Mur-Len consists of five lanes of traffic: two northbound lanes, two southbound lanes, and a southbound left-turn lane. The intersection is controlled by traffic lights as well as pedestrian signals. There is a sidewalk on the west side of Mur-Len. From the north side of 139th Street a pedestrian crosswalk extends across the five traffic lanes of Mur-Len to the sidewalk on the far side.

There are two sets of signals at the intersection: one is the traditional traffic lights for vehicular traffic, the other is a separate set of signals for pedestrian traffic. Vehicular traffic on Mur-Len has the green light for a period of at least 25 seconds. If the traffic signal system senses westbound vehicular traffic on 139th Street, the light for traffic on Mur-Len will turn red for at least 8 seconds to permit 139th Street vehicular traffic to turn either north or south onto Mur-Len.

The pedestrian signals consist of an "orange hand" symbol and a "walking man" symbol located on poles facing the crosswalk at each end. When the "orange hand" is illuminated, it is not safe to cross Mur-Len. When the "walking man" is illuminated, it is safe to do so. Below these illuminated symbols is a button which activates the pedestrian signals. When the signal button has not been pressed, the "orange hand" light is illuminated for pedestrians intending to cross Mur-Len, regardless of the color of the light for westbound vehicular traffic on 139th Street. Pressing the pedestrian signal button activates the green light cycle for traffic on 139th Street and increases the duration of the red light for vehicular traffic on Mur-Len from 8 seconds to at least 20 seconds. The "walking man" symbol is then illuminated, indicating it is safe for pedestrians to cross Mur-Len.

On the evening of May 20, 2004, Kendrick was on her way to work. She rode her bicycle close to the curb in the westbound lane

of 139th Street. When she reached the T intersection she stopped for the red light. She intended to cross Mur-Len to reach the sidewalk on the west side of the street and then proceed northbound on the sidewalk. Rather than pushing the button for the pedestrian signal, she waited for the light to turn green and then proceeded across Mur-Len, riding her bicycle in the crosswalk.

The signal for 139th Street traffic turned yellow when Kendrick was less than halfway across the intersection. Manda, who had been traveling southbound in the outside lane of Mur-Len, was either stopped at the light or coming to a stop. His view to the east, the direction Kendrick was coming from, was partially blocked by a large white Yukon Denali SUV stopped at the light in the inside, southbound through-traffic lane. When the light turned green for southbound traffic, Manda began to proceed into the intersection. As he did so, Kendrick came from in front of the Denali and into his lane of travel where she was struck by Manda's automobile. Kendrick was in the pedestrian crosswalk when she was struck.

*Jury Instructions*

The trial court gave the jury the standard PIK instructions relating to Manda's duty to keep a proper lookout and to exercise proper control over his vehicle in order to avoid colliding with another vehicle using the roadway. In addition, the trial court gave the jury two instructions relating to the duties of bicyclists. Instruction No. 13:

"The laws of Kansas provide that every person riding upon a roadway shall be subject to the provisions applicable to the driver of a vehicle, except those provisions which by their nature can have no application.

"A person riding a bicycle has the same obligations and is entitled to the same protection under the law as other persons in vehicles upon the highway."

Instruction No. 15:

"A 'pedestrian' is defined as any person afoot.

"A 'vehicle' is defined as every device in, upon or by which any person or property is or may be transported upon a highway, except devices moved by human power."

Manda requested two additional jury instructions regarding the duties of a pedestrian, which the trial court refused to give. The first was based on PIK Civ. 3d 121.37:

"At the time of this occurrence the plaintiff, Clarissa Kendrick, was required to obey the laws of the state of Kansas regarding pedestrians, and the defendant was required to obey the laws regarding motor vehicles."

Manda's second proposed instruction was based on K.S.A. 8-1509 and K.S.A. 8-1508 as set forth in PIK Civ. 3d 121.38:

"d— Pedestrian Control Signals

"The laws of Kansas provide that whenever special pedestrian control signals exhibiting the words 'walk' or 'don't walk' or symbols of 'walking persons' or 'upraised palm' are in place, such signals shall indicate as follows:

1. 'Flashing or steady walk or walking person.' Pedestrians facing the signal may proceed across the roadway in the direction of the signal and shall be given the right of way by the drivers of all vehicles.

2. 'Flashing or steady don't walk or upraised palm.' No pedestrian shall start to cross the roadway in the direction of the signal, but any pedestrian who has partially completed (his)(her) crossing on the 'walk' signal shall proceed to a sidewalk or safety island while the 'don't walk' signal is showing.

"e— Traffic Control Lights— Pedestrians

"The laws of Kansas provide that whenever traffic is controlled by traffic control lights the following rules shall apply to pedestrians:

1. Unless otherwise provided by a pedestrian control signal, pedestrians facing any green signal may proceed across the roadway within any marked or unmarked crosswalk.

2. Unless otherwise directed by a pedestrian control signal, pedestrians facing a steady yellow signal shall not start to cross the roadway.

3. Unless otherwise directed by a pedestrian control signal, pedestrians facing a steady red signal shall not enter the roadway.

4. A pedestrian may not proceed across a roadway when the sole green signal is a turn arrow."

During its deliberations, the jury submitted a question to the court, seeking clarification "as to where a bicyclist is expected to be on a roadway." The court referred the jury to its previously given instructions. Thereafter the jury returned its verdict, finding Manda 70% at fault and assessing damages of $70,990.40.

In this appeal Manda criticizes the district court's failure to instruct the jury on Kendrick's duties as a pedestrian in a crosswalk. Kendrick claims that Manda's proposed instructions were inappropriate since she was not a pedestrian at the time of the collision but, rather, was operating her bicycle on the roadway as a vehicle.

In Kansas, a bicycle is not a vehicle as Kendrick claims. K.S.A. 2006 Supp. 8-1485 defines a vehicle as "every device in, upon or

by which any person or property is or may be transported or drawn upon a highway, except . . . devices moved by human power." On the other hand, a bicyclist is also not a pedestrian. K.S.A. 2006 Supp. 8-1446 defines a pedestrian as "(a) [a]ny person afoot; (b) any person in a wheelchair, either manually or mechanically propelled, or other low powered, mechanically propelled vehicle designed specifically for use by a physically disabled person; or (c) any person using an electric personal assistive mobility device." However, if a bicyclist operates a bicycle on a roadway, K.S.A. 8-1587 provides that the bicyclist has the same rights and duties applicable to drivers of vehicles. See *Morrison v. Hawkeye Casualty Co.*, 168 Kan. 303, 312, 212 P.2d 633 (1949). Moreover, although bicyclists are not pedestrians, if they use sidewalks they have the same rights as pedestrians and are not subject to vehicular traffic laws. *Schallenberger v. Rudd*, 244 Kan. 230, 234-35, 767 P.2d 841 (1989).

Both parties rely on *Schallenberger* to support their positions. Manda argues that, consistent with *Schallenberger*, Kendrick assumed pedestrian status by entering the crosswalk and, therefore, had not only the rights but also the duties of a pedestrian, which included the duty to follow the pedestrian signals at the intersection. Kendrick argues that the analysis in *Schallenberger* supports her contention that she had the status of a driver of a vehicle because she was operating her bicycle on the roadway at all times before the collision.

*Schallenberger* is instructive, though not dispositive, since it does not directly address how traffic laws apply to a bicyclist such as Kendrick who, after riding her bike on the roadway occupied by vehicles, used a pedestrian crosswalk to access an adjoining sidewalk used by pedestrians. Schallenberger testified that she was riding her bicycle on the sidewalk and crossed the road at a controlled intersection in order to get to the sidewalk on the other side. In doing so she was struck by Rudd's automobile as he made a right turn on a red light. Rudd testified that Schallenberger was not on the sidewalk but was riding against the flow of traffic on the left side of the roadway. Schallenberger appealed an adverse judgment, claiming error in the jury instructions that classified her status as

that of a vehicle, thus causing the jury to find that either by riding on the sidewalk or against the flow of traffic she was necessarily at fault. The Kansas Supreme Court held that in the absence of some statutory prohibition, bicycles may legally be ridden on the sidewalks with pedestrians. Thus, bicycles may lawfully use the crosswalk with the same rights as pedestrians. The court reversed and remanded the case for a new trial based on the fact that the trial court should have instructed the jury that if Schallenberger was riding on the sidewalk, she had the right of way in using the crosswalk.

A number of courts from other jurisdictions have discussed the pedestrian status of bicyclists when using a pedestrian crosswalk. See *Belay v. District of Columbia*, 860 A.2d 365, 368 (D.C. 2004) (person riding bicycle across street in crosswalk has same rights as a pedestrian); *Lakewood v. El-Hayek*, 142 Ohio Misc. 2d 129, 872 N.E.2d 1005 (Ohio Mun. 2006) (a person's mere use of a wheeled device for transportation does not exclude that person from being a pedestrian when crossing from one sidewalk to another in a crosswalk); *Pudmaroff v. Allen*, 138 Wash. 2d 55, 70, 977 P.2d 574 (1999) (bicyclists are to be treated as pedestrians when using crosswalks to cross a roadway); *Nish v. Schaefer*, 138 P.3d 1134, 1140 (Wyo. 2006) (bicyclists have the same rights as pedestrians to use crosswalks at intersections). In keeping with the conclusions of other courts which have considered the issue, we equate a bicyclist with a pedestrian under the facts presented here.

Kendrick claims that she was operating her bicycle on the roadway at all times and in accordance with vehicular traffic laws. We question this conclusion. Westbound vehicles on 139th had two options on approaching Mur-Len: turn either left or right. They did not have the option of proceeding west across the intersection. Kendrick, on the other hand, rode her bicycle across Mur-Len using the pedestrian crosswalk in order to get to the sidewalk on the other side. K.S.A. 8-1411(b) defines a crosswalk as part of the roadway "distinctly indicated for pedestrian crossing." The *Schallenberger* court specifically noted that "users of bicycles . . . using the sidewalk also may lawfully use the crosswalk with the same rights as pedestrians." 244 Kan. at 235. Kendrick

operated her bicycle in an area where westbound traffic on 139th Street had no right to be. In doing so, she enjoyed not only the benefits of being treated as a pedestrian in a crosswalk, but assumed the attendant duties as well.

The trial court had the duty to properly instruct the jury on Manda's theory of the case if there was evidence to support it. See *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000); *Schallenberger*, 244 Kan. at 232. Manda's defense was that Kendrick failed to use the pedestrian traffic signal which would have extended the red light for traffic on Mur-Len and given her ample time to cross the street safely. Though Instruction No. 13 informed the jury that bicycles operated upon the roadway have the rights and duties of vehicles, the jury received no instruction about the rights and duties of pedestrians. The jury's later question to the court demonstrates its struggle with this issue. The jury was not given the law applicable to Manda's theory of the case for which supporting evidence was presented at trial. Accordingly, we must reverse and remand the case for a new trial.

### Sufficiency of the Evidence

### 1. Negligence

Manda argues that the "only evidence presented at trial indicated that both parties entered the intersection on green lights and neither saw the other. The mere fact that they collided is not evidence of negligence." Kendrick contends that there is ample evidence in the record to support that Manda failed to keep a proper lookout and failed to drive within his line of vision.

It is true that the mere fact of a collision does not establish negligence on the part of either participant. Also, there is a certain appeal to the argument that a motorist has the right to assume that others will obey the law until there is evidence to the contrary; and Manda, faced with a green light, might not expect a bicycle to suddenly appear in his path. While the facts here present a close question, we are not the factfinders. We view the evidence in the light most favoring the prevailing party, Kendrick. Viewed in that fashion, we are not prepared to say there was no evidence from which a jury could find some fault on the part of Manda. We defer

any further discussion, however, since the case must be remanded for retrial.

### 2. *Damages for Future Medical Expenses*

Finally, Manda argues that there was insufficient evidence at trial to support a jury award of damages for future medical expenses. We review the evidence of damages, as we reviewed the evidence of fault, in the light most favorable to Kendrick. *Warren v. Heartland Automotive Services, Inc.*, 36 Kan. App. 2d 758, 763, 144 P.3d 73 (2006). Damages need not be established with absolute certainty, and the jury can estimate damages using a reasonable basis for computation and the best evidence available under the circumstances. However, claims for damages that are conjectural and speculative cannot form a sound basis for an award. 36 Kan. App. 2d at 766.

Dr. Ronald Karlin treated Kendrick in the Olathe Medical Center emergency room immediately after the accident. He testified by deposition that Kendrick suffered severe strains and sprains but no fractures. Dr. Virginia Walker, who also testified by deposition, provided physical therapy and chiropractic adjustments to Kendrick's neck, upper back, right shoulder, and lower back from June through November 2004. Kendrick testified that she continued to suffer from head, neck, shoulder, and back pain nearly every day after her treatments with Walker ended.

Manda argues that neither Karlin nor Walker opined on the need for future medical treatments or the type or cost of such further treatment. On the other hand, Kendrick relies on *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 856 P.2d 906 (1993), for the proposition that future consequences of present injuries are compensable if there is a "recognized medical basis supporting the possibility."

In *Cott*, plaintiff, age 24 at the time of trial, suffered severe burns to her esophagus when she was mistakenly served lye in a mixed drink at a Topeka nightclub. Two doctors opined that Cott would need to be monitored and treated by a physician for medical problems for the rest of her life. One of the doctors recommended esophageal replacement surgery. Testimony was also presented

about the increased risk of Cott contracting esophageal cancer. Cott was awarded $1,100,000 for her current and future medical expenses. The Kansas Supreme Court upheld the award for future medical expenses, concluding that it was reasonable to foresee the need for future medical expenses, regardless of the different courses of treatment recommended. Accordingly, the jury's award was not based on mere speculation. *Cott*, 253 Kan. at 465-66.

Here, the trial was on December 12, 2005, 19 months after Kendrick's accident. Karlin saw Kendrick on the evening of the accident and then 5 days later. Karlin testified that it is common for a person suffering from the types of injuries sustained by Kendrick to suffer headaches for weeks or even months. He did not further quantify how long he would expect Kendrick's headaches to continue. He stated that it is typical for patients with Kendrick's injuries to seek follow-up treatment if they have persistent pain.

In June 2004, Kendrick sought follow-up treatment from Walker at Fulk Chiropractic Center. Walker's treatment of Kendrick ended in November 2004 when Walker concluded that Kendrick had improved as much as possible at the chiropractic level. Walker opined that Kendrick will have future flare-ups of pain in her neck, shoulder, lower back, and right hand. Walker could not predict how or when these flare-ups will occur.

Kendrick had not received any care and had not taken any medication for her injuries for over a year before trial. She testified, however, that she continued to suffer from head, neck, shoulder, and back pain nearly every day after her treatments with Walker ended.

Kendrick's medical expenses were $14,007.70. These expenses were for an ambulance, her emergency room treatment at Olathe Medical Center, the cost of an x-ray, an MRI examination, and her chiropractic bills. Over Manda's objections the court referred in the jury instructions and on the verdict form to Kendrick's future medical expenses. During closing arguments, Kendrick's counsel argued:

"Ladies and gentlemen, what are the damages? What do we know about the damages? We know they didn't contest the $14,000 in medical bills. So medical expense 14,070.

"What do we know about future medical? We know she's going to have flare-ups. Ladies and gentlemen, the treatment she got relieved her pain. My suggestion to you is in future medical you make it the same as her current medical."

The jury awarded Kendrick $14,007.70 for medical expenses to date and the exact same amount for future medical expenses.

We are well aware of the cases which hold that the inability of the jury to calculate damages with absolute exactness does not preclude a damage award. See *Kansas Dept. of SRS v. Goertzen*, 245 Kan. 767, 774, 783 P.2d 1300 (1989) (quoting *Vickers v. Wichita State University*, 213 Kan. 614, 619, 518 P.2d 512 [1974]). However, we are confronted here with a paucity of evidence to provide any basis for the jury to make its calculation. Kendrick's closing argument essentially invited the jury to pick a number out of thin air. The jury obliged. The prediction that Kendrick's future medical expenses will be the same as her medical expenses incurred to date finds no support in the evidence. It is a product of counsel's argument, not the evidence. The jury's finding that Kendrick will incur future medical expenses in the sum of $14,007.70 is not supported by the evidence. On retrial, the district court should not instruct on future medical expenses if nothing more is presented on this element of damages than what was presented at the first trial.

Reversed and remanded for retrial.